**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| ---------------------------------------------------------------- x | |
| In re: | : Chapter 11 Case No. |
| | : |
| AMERICAN HOME MORTGAGE | : Case No. 07-11047 (CSS) |
| HOLDINGS, INC., a Delaware corporation, <u>et al.</u>, | : |
| | : Jointly Administered |
| Debtors. | : |
| ---------------------------------------------------------------- x | |
| Calyon New York Branch, | : |
| | : |
| Plaintiff and | : |
| Counterclaim Defendant, | : |
| | : |
| v. | : Adv. Proc. No. 07-51704 (CSS) |
| | : |
| American Home Mortgage Corp., American Home | : |
| Mortgage Servicing, Inc., American Home Mortgage | : |
| Acceptance, Inc., and American Home Mortgage | : |
| Investment Corp., | : |
| | : |
| Debtor-Defendants and | : |
| Counterclaim Plaintiffs. | : |
| ---------------------------------------------------------------- x | |

## <u>ANSWER AND FIRST COUNTERCLAIM</u>[1]

The above-captioned debtors and debtors in possession (the "<u>Debtors</u>"), for their

Answer and First Counterclaim to the Complaint and Request for Declaratory Judgment,

Injunctive Relief and Damages (the "<u>Complaint</u>") filed by Calyon New York Branch ("<u>Calyon</u>"),

represent as follows:

---

[1]     Per a stipulated agreement with Calyon (the "<u>Stipulation</u>"), Debtors' affirmative defenses and counter claims are limited to certain issues as set for in the Stipulation and failure to raise additional affirmative defenses and counter claims is specifically reserved until a future date and shall not constitute a waiver of those claims and defenses.

## PRELIMINARY STATEMENT

This section of the Complaint contains statements of law to which no responsive pleading is required. To the extent a response is required, the averments are denied.

## JURISDICTION AND VENUE

1.     Admitted.

2.     Admitted.

3.     Admitted that this is an adversary proceeding within the meaning of Fed. R. Bankr. P. 7001. The remaining averments in this paragraph are denied.

## THE PARTIES

4.     Admitted that Calyon is the Administrative Agent. The Debtors lack sufficient knowledge or information to form a belief as to the truth of the remaining averments in paragraph 4 of the Complaint.

5.     Admitted.

6.     Admitted.

7.     Admitted.

8.     Admitted.

## BACKGROUND FACTS

9.     Admitted.

10.     Admitted that copies of the agreements are attached to the Complaint. The remaining averments in this paragraph constitute legal conclusions to which no responsive pleading is required. To the extent a response is required, the averments are denied.

11. Admitted that on November 21, 2006, the Debtors were in the business, among other things, of originating, acquiring, investing in, marketing and selling, for their own account, mortgage loans that were made either to finance the purchase of one-to-four family owner-occupied homes or to refinance loans secured by such properties. The remaining averments in this paragraph are denied.

12. Paragraph 12 contains legal conclusions to which no responsive pleading is required. To the extent a response is required, the averments are denied.

13. Admitted.

14. Admitted that the Debtors received a letter dated August 1, 2007, purporting to be a notice of seller's default, a copy of which letter is attached to the Complaint. The remaining averments in this paragraph constitute legal conclusions to which no responsive pleading is required. To the extent a response is required, the averments are denied.

15. Paragraph 15 contains legal conclusions to which no responsive pleading is required. To the extent a response is required, the averments are denied.

16. Admitted that the Debtors received letters dated August 1, 2007, purporting to be a notice of servicer's default and a notice of change of servicer, copies of which letters are attached to the Complaint. The remaining averments in this paragraph constitute conclusions of law to which no responsive pleading is required. To the extent a response is required, the averments are denied.

17. Paragraph 17 contains legal conclusions to which no responsive pleading is required. To the extent a response is required, the averments are denied.

DB02:6229414.5

066585.1001

18.     Admitted that Calyon had not identified a new Servicer as of August 1, 2007.  The remaining averments in this paragraph constitute legal conclusions to which no responsive pleading is required.  To the extent a response is required, the averments are denied.

19.     Admitted that the Debtors received letters dated August 6, August 13, and August 20, 2007, purporting to be notices, copies of which letters are attached to the Complaint. The remaining averments in this paragraph constitute legal conclusions to which no responsive pleading is required.  To the extent a response is required, the averments are denied.

20.     Admitted that the Debtors received a letter dated August 28, 2007, purporting to be a notice, a copy of which letter is attached to the Complaint.  The remaining averments in this paragraph constitute legal conclusions to which no responsive pleading is required.  To the extent a response is required, the averments are denied.

21.     Admitted that the August 28, 2007, letter requested that the Debtors take certain actions.  The Debtors have insufficient knowledge or information to form a belief as to the truth of the remaining averments in this paragraph.

22.     Admitted that the Debtors received letters dated July 29, 2007, copies of which are attached to the Complaint.  The remaining averments in this paragraph constitute legal conclusions to which no responsive pleading is required.  To the extent a response is required, the averments are denied.

23.     Admitted that the Debtors have not turned over servicing rights or mortgage funds to Calyon or its designee.  The remaining averments in this paragraph constitute legal conclusions to which no responsive pleading is required.  To the extent a response is required, the averments are denied.

DB02:6229414.5                                                                                                          066585.1001

24.     Paragraph 24 contains legal conclusions to which no responsive pleading is required.  To the extent a response is required, the averments are denied.

25.     Paragraph 25 contains legal conclusions to which no responsive pleading is required.  To the extent a response is required, the averments are denied.

## AS TO THE FIRST CAUSE OF ACTION

26.     Debtors repeat and incorporate by reference the answers in paragraphs 1 through 25.

27.     Paragraph 27 contains legal conclusions to which no responsive pleading is required.  To the extent a response is required, the averments are denied.

28.     Paragraph 28 contains legal conclusions to which no responsive pleading is required.  To the extent a response is required, the averments are denied.

29.     Paragraph 29 contains legal conclusions to which no responsive pleading is required.  To the extent a response is required, the averments are denied.

30.     Paragraph 30 contains legal conclusions to which no responsive pleading is required.  To the extent a response is required, the averments are denied.

31.     Denied.

## AS TO THE SECOND CAUSE OF ACTION

32.     Debtors repeat and incorporate by reference the answers in paragraphs 1 through 31.

33.     Paragraph 33 contains legal conclusions to which no responsive pleading is required.  To the extent a response is required, the averments are denied.

34.     Paragraph 34 contains legal conclusions to which no responsive pleading is required.  To the extent a response is required, the averments are denied.

DB02:6229414.5                                      066585.1001

35. Admitted that the Debtors have not turned over servicing rights or mortgage funds to Calyon or its designee. The remaining averments in this paragraph constitute legal conclusions to which no responsive pleading is required. To the extent a response is required, the averments are denied.

36. Denied.

## AS TO THE THIRD CAUSE OF ACTION

37. Debtors repeat and incorporate by reference the answers in paragraphs 1 through 36.

38. Paragraph 38 contains legal conclusions to which no responsive pleading is required. To the extent a response is required, the averments are denied.

39. Denied.

40. Denied.

41. Admitted that the Debtors have not turned over servicing rights or mortgage funds to Calyon or its designee. The remaining averments in this paragraph constitute legal conclusions to which no responsive pleading is required. To the extent a response is required, the averments are denied.

42. Denied.

## AS TO THE FOURTH CAUSE OF ACTION

43. Debtors repeat and incorporate by reference the answers in paragraphs 1 through 42.

44. Paragraph 44 contains legal conclusions to which no responsive pleading is required. To the extent a response is required, the averments are denied.

45. Denied.

DB02:6229414.5 066585.1001

46.     Denied.

47.     Paragraph 47 contains a statement of law to which no responsive pleading is required. To the extent a response is required, the averments are denied.

## AS TO THE FIFTH CAUSE OF ACTION

48.     Debtors repeat and incorporate by reference the answers in paragraphs 1 through 47.

49.     Paragraph 49 contains a statement of law to which no responsive pleading is required. To the extent a response is required, the averments are denied.

50.     Denied.

51.     Admitted that the Debtors have not turned over servicing rights or mortgage funds to Calyon or its designee. The remaining averments in this paragraph are denied.

52.     Admitted that the Repurchase Agreement was identified in the Notice of (I) Possible Assumption and Assignment of Certain Leases, License Agreements, and Executory Contracts; and (II) Proposed Cure Obligations, If Any, dated August 27, 2007. The remaining averments in this paragraph are denied.

53.     Admitted that the Debtors have refused to remit funds to Calyon. The remaining averments in this paragraph are denied.

54.     Paragraph 54 contains a statement of law to which no responsive pleading is required. To the extent a response is required, the averments are denied.

## AS TO THE SIXTH CAUSE OF ACTION

55.     Debtors repeat and incorporate by reference the answers in paragraphs 1 through 55.

DB02:6229414.5                                                        066585.1001

56.     Denied that 11 U.S.C. § 559 applies or that this action is otherwise excepted from the automatic stay.  Debtors have insufficient knowledge and information to form a belief as to the truthfulness of the remaining averments in this paragraph.

57.     Denied.

58.     Admitted.

59.     Paragraph 56 contains a statement of law to which no responsive pleading is required.  To the extent a response is required, the averments are denied.

## AS TO THE SEVENTH CAUSE OF ACTION

60.     Debtors repeat and incorporate by reference the answers in paragraphs 1 through 59.

61.     Denied.

62.     Denied.

63.     Denied.

64.     Denied.

65.     Denied.

## AS TO THE EIGHTH CAUSE OF ACTION

66.     Debtors repeat and incorporate by reference the answers in paragraphs 1 through 65.

67.     Denied.

68.     Denied.

69.     Denied.

70.     Denied.

DB02:6229414.5     066585.1001

## AS TO THE NINTH CAUSE OF ACTION

71.     Debtors repeat and incorporate by reference the answers in paragraphs 1 through 70.

72.     Denied.

73.     Denied.

74.     Denied.

75.     Denied.

## AS TO THE TENTH CAUSE OF ACTION

76.     Debtors repeat and incorporate by reference the answers in paragraphs 1 through 75.

77.     Denied.

78.     Denied.

79.     Denied.

80.     Denied.

## AS TO THE ELEVENTH CAUSE OF ACTION

81.     Debtors repeat and incorporate by reference the answers in paragraphs 1 through 80.

82.     Denied.

83.     Denied.

84.     Denied.

DB02:6229414.5                                                          066585.1001

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

The Complaint is void *ab initio* because it was filed in violation of section 362(a) of the Bankruptcy Code, which applies because, among other reasons, (i) the Repurchase Agreement is not a "repurchase agreement" within the meaning of sections 101(47) and 559 of the Bankruptcy Code, and (ii) even if it were, the Debtors' servicing rights fall within the exclusion of agreements or transactions under a master agreement for mortgage loans contemplated by section 101(47)(A)(iv) of the Bankruptcy Code.

### SECOND AFFIRMATIVE DEFENSE

The Complaint fails to state a claim upon which relief can be granted against the Debtors.

### THIRD AFFIRMATIVE DEFENSE

Any *ipso facto* default provision in the Repurchase Agreement is unenforceable against the Debtors by virtue of sections 541(c)(1) and 365(e)(1) of the Bankruptcy Code, which apply because, among other reasons, (i) the Agreement is not a "repurchase agreement" within the meaning of sections 101(47) and 559 of the Bankruptcy Code, and (ii) even if it were, the Debtors' servicing rights fall within the exclusion of agreements or transactions under a master agreement for mortgage loans contemplated by section 101(47)(A)(iv) of the Bankruptcy Code.

### FOURTH AFFIRMATIVE DEFENSE

Calyon's claims against the Debtors are barred, in whole or in part, by the equitable doctrine of estoppel.

DB02:6229414.5 066585.1001

## FIFTH AFFIRMATIVE DEFENSE

Calyon's claims against the Debtors are barred, in whole or in part, due to Calyon's inequitable conduct and/or unclean hands.

## SIXTH AFFIRMATIVE DEFENSE

Calyon is not entitled to specific performance of Debtors' obligations under the Agreement, or the substantive equivalent of specific performance, because Calyon is in material breach of the Repurchase Agreement.

## SEVENTH AFFIRMATIVE DEFENSE

Calyon is not entitled to specific performance of the Debtors' obligations under the Repurchase Agreement, or the substantive equivalent of specific performance, because Calyon has an adequate remedy at law.

## FIRST COUNTERCLAIM

## PRELIMINARY STATEMENT

1.     Prior to the Petition Date, American Home Mortgage Holdings, Inc. and its affiliated debtors and debtors in possession (the "Debtors") relied on several warehouse financing arrangements as a source of liquidity to finance operations, including, without limitation, the Calyon Agreement (as defined below).  The Counterclaim Plaintiffs (as defined below) maintain that:

> (a)     The Calyon Agreement does not constitute a "repurchase agreement" as that term is used in section 101(47) of the Bankruptcy Code, 11 U.S.C. § 101(47);

> (b)     The Calyon Agreement constitutes and should be characterized as a disguised secured financing, which includes, inter alia, a "security agreement" as that term is defined in section 101(50) of the Bankruptcy Code, 11 U.S.C. § 101(50) (though security interests relating thereto may not be properly perfected

11

under applicable non-bankruptcy law), and a "transaction . . . that creates a security interest in personal property . . . by contract" within the meaning of section 9-109(a)(1) of the Uniform Commercial Code, N.Y. U.C.C. Law § 9-109(a)(1); and

(c)     Any and all property (i) in the Counterclaim Plaintiffs' possession or control, (ii) in the Custodian's (as defined in the Calyon Agreement) possession or control, and (iii) in the Counterclaim Defendant's (as defined below) and the Lenders' (as defined below) possession or control pursuant to the Calyon Agreement or any other documents executed in connection therewith, including, without limitation, the Custodial Agreement, constitutes property of the Debtors' estates under section 541 of the Bankruptcy Code, 11 U.S.C. § 541.

## JURISDICTION

2.     The Court has jurisdiction over this Counterclaim pursuant to 28 U.S.C. §§ 157 and 1334.

3.     This is a core proceeding pursuant to 28 U.S.C. § 157(b).

4.     Venue is proper in this district pursuant to 28 U.S.C. § 1409.

## FACTUAL BACKGROUND

**A.     The Loan Agreement**

5.     On or about November 22, 2005, AHM SPV I, LLC, a Delaware limited liability company, as Borrower, entered into that certain Amended And Restated Loan Agreement (the "Loan Agreement"),[2] with certain Issuers and Banks (as defined therein), and American Home Mortgage Servicing, Inc., as Servicer.  The Loan Agreement recognized, among other things that:

(a)     "The Borrower . . . Calyon, as a Bank and as the Administrative Agent, and American Home Mortgage Corp. have entered into that certain Loan Agreement dated as of August 8, 2003 . . . (the 'Original Loan Agreement')" (Loan Agreement, Recitals ¶ 2);

---

[2]     Capitalized terms not otherwise defined in this paragraph (and sub-paragraphs) have the meanings ascribed to such terms in the Loan Agreement.

DB02:6229414.5                                                                                    066585.1001

(b)     "The Originators[3] are engaged in the business of originating, acquiring, investing in, marketing and selling, for their own account, mortgage loans that are made either to finance the purchase of one- to four-family owner-occupied homes or to refinance loans secured by such properties" (Loan Agreement, Recitals ¶ 5);

(c)     "The Borrower has purchased, and may continue to purchase, Eligible Mortgage Loans from the Originators, as determined from time to time by the Borrower and the Originators.  In order to finance such purchases, the Borrower has requested that the Lenders[4] provide the Borrower with credit in the form of revolving loans on the terms and conditions set forth herein."  (Loan Agreement, Recitals ¶¶ 6-7);

(d)     "The Issuers may, in their sole discretion . . . and the Banks . . . shall, in each case subject to the terms and conditions contained in this Agreement, make Advances[5] to the Borrower secured by a lien on, and security interest in, the Mortgage Loans and certain other Collateral." (Loan Agreement, Recitals ¶ 8); and

(e)     "The Lenders have appointed the Administrative Agent as their agent to perform certain administrative duties for the Lenders, including, among other things, the administration of the funding of the transactions hereunder . . . ." (Loan Agreement, Recitals ¶ 9.)

6.     The Loan Agreement was a secured financing collateralized by the Mortgage Loans and certain other Collateral (as defined therein).  The Borrower's Obligations[6] thereunder were secured by liens on, and security interests in those assets.

## B.     The Calyon Agreement

7.     On or about November 21, 2006, Caylon New York Branch, As a Bank, a Managing Agent, and as the Administrative Agent ("Calyon"), entered into a secured financing

---

[3]     The Loan Agreement defined "Originators" to mean American Home Mortgage Corp., American Home Mortgage Servicing, Inc., and their respective successors and assigns.  (Loan Agreement p. 30.)

[4]     The Loan Agreement defined "Lenders" to mean the "Issuers and the Banks."  (Loan Agreement p. 24.)

[5]     The Loan Agreement defined "Advances" to mean "any amount disbursed by the Lenders to the Borrower pursuant to Section 2.1, whether such amount constitutes an original disbursement of funds to the Borrower under this Agreement or a continuation of an amount outstanding."  (Loan Agreement p. 4.)

[6]     The Loan Agreement defines "Obligations" as, inter alia, "any and all present and future indebtedness, obligations and liabilities of the Borrower to any of the Lenders, the Collateral Agent, each Managing Agent . . . ." (Loan Agreement p. 29.)

agreement entitled that certain Repurchase Agreement (the "Calyon Agreement")[7] with American Home Mortgage Corp., as a Seller ("AHMC"); American Home Mortgage Servicing, Inc., as a Seller and as the Servicer (as defined therein) ("AHMS"); American Home Mortgage Acceptance, Inc., as a Seller ("AHMA"); American Home Mortgage Investment Corp., as Seller and Performance Guarantor (as defined therein) ("AHMIC," and together with AHMC, AHMS, and AHMA, the "American Home Parties"); La Fayette Asset Securitization, LLC, as an Issuer (as defined therein) ("La Fayette"); Amsterdam Funding Corporation, as an Issuer ("Amsterdam"); Barton Capital LLC, as an Issuer ("Barton"); Park Avenue Receivables Company, as an Issuer ("Park Avenue"); Starbird Funding Corporation, as an Issuer ("Starbird"); Lloyds TSB Bank PLC, as a Bank ("Lloyds"); ABN Amro Bank N.V., as a Bank and as a Managing Agent ("ABN AMRO"); Societe Generale, as a Bank and as a Managing Agent ("SG"); JPMorgan Chase Bank, N.A, as a Bank and as a Managing Agent ("JPMorgan"); and BNP Paribas, as a Bank and as a Managing Agent ("BNP Paribas," and together with Calyon, La Fayette, Amsterdam, Barton, Park Avenue, Starbird, Lloyds, ABN AMRO, SG, and JPMorgan, the "Lenders").

        8.     The Calyon Agreement constitutes a secured loan to the American Home Parties structured against a pooled portfolio of approximately 5,675 mortgages.

        9.     The Calyon Agreement recognized, among other things, that "[f]or the convenience of the parties and to reduce administrative costs, the parties hereto have agreed to terminate the Existing Loan Agreement [the Original Loan Agreement and Loan Agreement] and enter into this Repurchase Agreement for the Existing Loan Agreement . . . ." (Calyon Agreement, Recitals ¶ 6.)

---

[7]     Capitalized terms not otherwise defined in this paragraph (and sub-paragraphs) have the meanings ascribed to such terms in the Calyon Agreement.

10.     Under the Calyon Agreement, Calyon and the purported "Purchasers," defined as "collectively, the Issuers and the Banks" (i.e., the Lenders) (Calyon Agreement p. 27) transferred funds to the American Home Parties on account of certain Eligible Mortgage Loans (as defined therein), which included Mortgage Loans (as defined therein).  The Sellers agreed to repurchase certain Purchased Mortgage Loans (as defined therein) on the applicable Repurchase Date (as defined therein).  (Hereinafter, the Eligible Mortgage Loans, the Mortgage Loans and the Purchased Mortgage Loans shall be referred to as the "Purportedly Purchased Assets".)

11.     While the Calyon Agreement obligates the American Home Parties to "repurchase" the Purchased Mortgage Loans, styling the arrangement as a "Repurchase Agreement" elevates form over substance.  Retaining substance over form, the Purportedly Purchased Assets actually serve as collateral to secure the financing the Lenders extended to the American Home Parties under the Calyon Agreement.

12.     The Calyon Agreement was not modeled upon, nor did it retain key characteristics of, the standard documentation governing repurchase agreements.  Instead, it was crafted through discrete amendments to the Loan Agreement, retaining all the characteristics of the secured financing consummated under that agreement.  Indeed:

### _Purchases_

(a)     While the Calyon Agreement provided that, "[s]ubject to the terms of this Agreement . . . an Issuer may, in its sole discretion, make a Purchase (which Purchases are to be made pro rata based on the Issuer Facility Amounts) . . . so long as each Purchase is the least of (x) the Availability, (y) the Available Recognized Value, and (z) $25,000,000", the Loan Agreement provided that, "[s]ubject to the terms of this Agreement, from the Initial Funding Date . . . an Issuer may, in its sole discretion, made an Advance (which Advances are to be made pro rata based on the Issuer Facility Amounts) . . . so long as each Borrowing is the least of (x) the Availability, (y) the Available Collateral Value, and (z) $25,000,000".  (Compare Calyon Agreement § 2.1 ("Maximum Facility Amount") with Loan Agreement § 2.1 ("Maximum Facility Amount").)

(b)    While the Calyon Agreement provided that "[t]he Sellers shall give the Administrative Agent and the Custodian notice of each request for a Purchase, pursuant to the Purchase Report", the Loan Agreement provided that "[t]he Borrower shall give the Administrative Agent and the Collateral Agent notice of each request for a Borrowing, pursuant to a Borrowing Report".  (Compare Calyon Agreement § 2.3(a)(i) ("Notice and Manner of Obtaining Purchases") with Loan Agreement § 2.3(a)(i) ("Notice and Manner of Obtaining Borrowings").)

(c)    While the Calyon Agreement provided that "[e]ach Purchase by an Issuer shall initially be funded by the issuance of commercial paper by such Issuer" and that "[e]ach Purchase by a Bank shall be either a Base Rate Purchase or a Eurodollar Purchase", the Loan Agreement provided that "[e]ach Advance by an Issuer shall be funded by the issuance of commercial paper by such Issuer" and that "[e]ach Advance by a Bank shall be either a Base Rate Advance or a Eurodollar Advance".  (Compare Calyon Agreement § 2.3(b) ("Type of Purchase") with Loan Agreement § 2.3(b) ("Type of Loan").)

### *Security*

(d)    While the Calyon Agreement provided that "[t]he Sellers have executed and delivered to the Administrative Agent and the Custodian, as applicable: (a) the Collection Account Control Agreement, and (b) the Reserve Account Control Agreement; as more fully provided in the Custodial Agreement" and that "[t]he Sellers further agree to execute all documents and instruments, and perform all other acts deemed necessary by the Administrative Agent or any Managing Agent to further the intent and purposes of this Agreement, to create and perfect, and maintain the interests of the Purchasers in the Mortgage Assets", the Loan Agreement Provided that, "[t]o secure payment of the Obligations, the Borrower has executed and delivered to the Administrative Agent and the Collateral Agent, as applicable: (a) the Security Agreement, (b) the Collection Account Control Agreement, and (c) the Reserve Account Control Agreement; as more fully provided for in the Collateral Agency Agreement" and that "[t]he Borrowers further agree to execute all documents and instruments, and perform all other acts deemed necessary by the Administrative Agent or any Managing Agent to create and perfect, and maintain the security interests and collateral assignments in favor of the Administrative Agent for the benefit of the holders of the Obligations, as perfected first priority security interests".  (Compare Calyon Agreement § 3.1 ("Mortgage Assets") with Loan Agreement § 3.1 ("Collateral").)

### *Base-Rate Interest*

(e)    While the Calyon Agreement provided that, "[e]xcept where specifically otherwise provided, Purchases in respect of any CP Allocation shall accrue Price Differential with respect to each Price Differential Calculation Period compromising such CP Allocation at a rate per annum equal to the Commercial Paper Rate applicable to such Price Differential Calculation Period, and the

Purchases in respect of any ABR Allocation shall accrue Price Differential at either the Eurodollar Rate plus the Bank Margin, or the Alternate Base Rate", the Loan Agreement provided that, "[e]xcept where otherwise provided, Borrowings in respect of any CP Allocation shall bear interest with respect to each Interest Period comprising such CP Allocation at a rate per annum equal to the Commercial Paper Rate applicable to such Interest Period, and Borrowing in respect of any ABR Allocation shall bear interest at either the Eurodollar Rate plus the Bank Margin, or the Alternate Base Rate". (<u>Compare</u> Calyon Agreement § 2.10 ("Price Differential Rates") <u>with</u> Loan Agreement § 2.10 ("Interest Rates").)

### ***Default-Rate Interest***

(f)     While the Calyon Agreement provided that, "[s]o long as any Event of Default exists, all Repurchase Obligations shall accrue Price Differential at the Default Rate until paid, regardless of whether such payment is made before or after entry of a judgment" and that, "[f]or the avoidance of doubt, once such Event of Default is cured all Repurchase Obligations shall bear interest in accordance with Section 2.10," the Loan Agreement provided that, "[s]o long as any Event of Default exists, all Obligations shall bear interest at the Default Rate until paid, regardless of whether such payment is made before or after entry of a judgment" and that, "[f]or the avoidance of doubt, once such Event of Default is cured all Obligations shall bear interest in accordance with Section 2.10". (<u>Compare</u> Calyon Agreement § 2.12 ("Default Rate") <u>with</u> Loan Agreement § 2.12 ("Default Rate").)

13.    The following provisions, among other things, further demonstrate the Calyon Agreement is a disguised secured financing in that two critical characteristics of a standard repurchase agreement were lacking: (a) the American Home Parties did not relinquish legal, equitable, substantive, or practical ownership of the assets they transferred to the Lenders and (b) the Lenders lacked any meaningful property rights, including the unfettered right to freely dispose of the Purportedly Purchased Assets:

(a)     The Calyon Agreement did not authorize Calyon to "<u>sell</u>" the Purportedly Purchased Assets absent an Event of Default. (<u>Compare</u> <u>id.</u> § 2.23(d) (p. 55) ("The Administrative Agent, on behalf of the Purchasers, shall have free and unrestricted use of all Mortgage Loans, and nothing in this Repurchase Agreement shall preclude the Administrative Agent, on behalf of the Purchasers, from engaging in repurchase transactions with the Mortgage Loans or otherwise pledging, repledging, transferring, hypothecating, or rehypothecating the Mortaged Loans, on terms, and subject to conditions, within the Administrative Agent, on behalf of the Purchaser's absolute discretion, in all cases subject to the

Purchaser's obligation to reconvey the Mortgage Loans on the Repurchase Date.") <u>with</u> § 8.2(c) (p. 87) (providing that, upon Event of Default, Administrative Agent may "sell, without any notice or demand of any kind, at a public or private sale and at such price or prices as the Administrative Agent may reasonably deem satisfactory any or all Mortgaged Loans").)

    (b)    The Calyon Agreement did not authorize the Purchasers to return "replacement" mortgages with "same or similar" features to the Purportedly Purchased Assets. Instead, the Purchasers must return the identical assets the American Home Parties purportedly "sold" them, which restricted entirely Calyon's ability to resell the Purportedly Purchased Assets during the term of the Calyon Agreement. Unlike a true "repurchase agreement," Calyon had no right to deliver equivalent Purportedly Purchased Assets to the American Home Parties on the Repurchase Date (as defined therein), and the Calyon Agreement does not even contemplate a mechanism to adjust the Repurchase Price in such an event.

    (c)    The nature of the Purportedly Purchased Assets, including the types of mortgage loans involved and the related servicing rights, preclude the Calyon Agreement from being a "repurchase agreement" within the meaning of section 101(47) of the Bankruptcy Code, 11 U.S.C. § 101(47).

    14.    Calyon's ability to transfer the Purportedly Purchased Assets is further limited by the Calyon Agreement's restrictions against replacing AHMS as "Servicer" of those assets. "Servicer" is defined as "at any time the Person then authorized pursuant to Section 11.1 to administer and collect the Mortgage Loans on behalf of the Purchasers. The initial Servicer shall be [AMHS]." (Calyon Agreement p. 31.)

    15.    Calyon only had the authority to replace AHMS as Servicer upon the occurrence of a Servicer Default (as defined therein). (<u>See</u> Calyon Agreement § 11.1 ("The servicing, administration and collection of the Mortgage Assets shall be conducted by the Servicer so designated hereunder from time to time. Until the Administrative Agent gives notice to the Sellers of the designation of a new Servicer after the occurrence of a Default or an Event of Default, [AHMS] . . . is hereby designated as, and hereby agrees to perform the duties and obligations of, the Servicer pursuant to the terms hereof.").)

16.    Absent a Servicer Default, AHMS was appointed Servicer and could, with the consent of the Majority Banks (as defined therein), which "shall not be unreasonably withheld or delayed . . . subcontract with any other person for the servicing, administration, or collection of the Mortgage Assets."  (Calyon Agreement § 11.1.)

17.    Unlike a true "repurchase agreement," Calyon had no legal or practical ability to alienate ownership of the Purportedly Purchased Assets away from the American Home Parties during the term of the Calyon Agreement.

18.    Further evidencing that the Calyon Agreement is a secured financing are the covenants and other provisions it contains that are usual and customary for secured financing agreements of this type and size, including, without limitation, the following:

(a)    The "Conditions Precedent" to the Lenders' performance of their funding obligations contain a "material adverse effect" or "MAC Out," specifically that "no change or event that constitutes a Material Adverse Effect shall have occurred and be continuing as of the date of such Purchase."  (Calyon Agreement § 4.2(d) (p. 65); see id. § 1.1 (p.23) (defining "Material Adverse Effect" to include "any material adverse effect on . . . (ii) the business, operations, total Property or financial condition of such Person, [or] (iii) the Mortgaged Assets").)

(b)    The American Home Parties were authorized, in certain circumstances, to replace (or "yank") the existing Banks.  (See Calyon Agreement § 2.20(a) (p. 53) ("Upon the election of any Affected Party to request reimbursement by the Sellers for increased costs . . . or for compensation in respect of withholding taxes . . . the Sellers may, upon prior written notice to the Administrative Agent and such Affected Party, seek a replacement Bank to whom such additional costs or taxes shall not apply and which shall be reasonably satisfactory to Administrative Agent.").)

(c)    The Calyon Agreement contains both a specific "Termination Date" and a specific "Repurchase Date."  (See id. § 1.1 (pp. 29, 33).)

(d)    The American Home Parties are bound by covenants (i) requiring the maintenance of "Minimum Tangible Net Worth" and "Collateral Value to Adjusted Consolidated Funded Debt Ratio;" (ii) demanding notice of material litigation or Material Adverse Effects; (iii) prohibiting material changes to corporate structure, e.g., mergers and acquisitions; (iv) requiring minimum insurance levels; (v) directing that the American Home Parties provide financial

statements and reports; and (vi) requiring that the Sellers and Servicers keep books of records and account.  (See Calyon Agreement §§ 6.1, 6.6, 6.7, 6.9, 7.1, 7.16, 7.17, and 7.18.)

(e)     The American Home Parties' "Repurchase Obligations" are defined to include "any and all present and future indebtedness, obligations, and liabilities of the Sellers to any of the Purchasers, the Custodian, each Managing Agent, each Affected Party, each Indemnified Party and the Administrative Agent, including all Repurchase Prices".  (See Calyon Agreement § 1.1 (p. 29) (emphasis added).).

(f)     Events of Default include, among other things, (i) the failure to make timely payments relating to any "Indebtedness" in excess of $1.5 million; (ii) certain Material Adverse Effects; and (iii) certain judgments (in excess of $5 million that remain unpaid) and governmental actions;

(g)     The agreement references the parties' purported intention that the purported purchases and sales constitute "sales," but provides expressly that in the event they are not characterized as sales, the Sellers are deemed to have granted the Purchasers first priority security interests in the Mortgaged Assets, and the Calyon Agreement shall be deemed to be a "security agreement."  (Calyon Agreement § 2.23 (p. 55).)

19.     Additional evidence that the Calyon Agreement constitutes a secured financing and not a repurchase agreement is found in any one or all of the following:

(a)     The course of dealing between the parties is consistent with their treatment of the agreement as a secured financing, including, without limitation, (i) the parties' conduct under the Original Loan Agreement and the Loan Agreement, which continued under the Calyon Agreement, (ii) Calyon's inability to transfer the Purportedly Purchased Assets during the term of the Calyon Agreement, and (iii) the making of "advances" by Calyon;

(b)     The American Home Parties were unable to substitute the Purportedly Purchased Assets with the same or similar mortgages;

(c)     The interest payable under the Calyon Agreement (or imputed thereunder) bears no direct relationship to the interest rates applicable to the Purportedly Purchased Assets; and

(d)     There is no short-term liquid market for the Purportedly Purchased Assets.

20.     Because the economic realities of the transactions consummated pursuant to the Calyon Agreement are such that the agreement constitutes a secured financing, Calyon

should be estopped from claiming the Calyon Agreement constitutes a "repo agreement" or "repurchase agreement" as defined in section 101(47) of the Bankruptcy Code or otherwise constitutes a "true sale."

21.    By virtue of the forgoing, the Calyon Agreement is properly characterized as a secured financing.

## COUNT I
### (Declaratory Judgment)

22.    Debtors incorporate by reference the allegations contained in paragraphs 1 through 21 of the Counterclaims by reference.

23.    This claim for relief arises under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201.

24.    Despite the title given to the Calyon Agreement, it contains provisions that establish that it is actually a disguised financing agreement and, therefore, not subject to the provisions of the Bankruptcy Code dealing with true repurchase agreements.

25.    The conduct of the parties in regard to the Calyon Agreement show that it was intended to be considered a financing agreement by the parties.

26.    Because the parties dispute whether the Calyon Agreement is a true repurchase agreement rather than a disguised financing agreement that creates a security interest, an actual, justiciable controversy exists and the Court should declare that the Calyon Agreement is in fact a disguised financing agreement not subject to the provisions of the Bankruptcy Code dealing with true repurchasing agreements.

DB02:6229414.5                    066585.1001

# PRAYER FOR RELIEF

WHEREFORE, Counterclaim Plaintiffs respectfully request that this Court enter judgment in their favor and grant the following relief:

(a)     Dismissal of the Complaint against the Debtors in its entirety and with prejudice;

(b)     Declaratory Judgment of the Court decreeing that the Calyon Agreement is not a "repo agreement" or a "repurchase agreement" as that term is defined under section 101(47) of the Bankruptcy Code, 11 U.S.C. § 101(47);

(c)     Declaratory Judgment of the Court decreeing that the Calyon Agreement is not a "true sale";

(d)     Declaratory Judgment of the Court decreeing that the Calyon Agreement is a disguised secured financing which includes, among other things, a "security agreement" as that term is defined under section 101(50) of the Bankruptcy Code, 11 U.S.C. § 101(50), and a "transaction . . . that creates a security interest in personal property . . . by contract" within the meaning of section 9-109(a)(1) of the Uniform Commercial Code, N.Y. U.C.C. Law § 9-109(a)(1);

(e)     Declaratory Judgment of the Court that any and all property (i) in the Counterclaim Plaintiffs' possession or control, (ii) in the Custodian's or Lenders' possession or control, and (iii) in the Counterclaim Defendant's possession or control pursuant to the Calyon Agreement, the Custodian Agreement or any other documents executed in connection therewith, including, without limitation, the Purportedly Purchased Assets and any agreements relating to the Servicer's rights, constitutes property of the Debtors' estates under section 541 of the Bankruptcy Code, 11 U.S.C. § 541;

(f)     Declaratory Judgment of the Court that any and all conduct by Calyon, the Custodian, or the Lenders with respect to the Purportedly Purchased Assets is subject to Article 9 of the Uniform Commercial Code, N.Y. U.C.C. §§ 9-101 et seq.;

(g)     An Order directing that Calyon, the Custodian, the Lenders, and any other parties to the Calyon Agreement and any agreements executed in connection therewith, including, without limitation, the Custodian Agreement, turn over to the Debtors within five (5) business days of the entry of such Order any and all property in their possession or control on account of such agreements;

(h)     Judgment in favor of the Counterclaim Plaintiffs on the Counterclaim set forth herein;

(i)     Judgment awarding the Debtors costs and attorneys' fees; and

22

(j)     Any other, further relief the Court deems just and appropriate.

Wilmington, Delaware
September 11, 2007

YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ Robert S. Brady
_____

James L. Patton, Jr. (No. 2202)
Robert S. Brady (No. 2847)
John T. Dorsey (No. 2988 )
Sharon M. Zieg (No. 4196)
Erin D. Edwards (No. 4392)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

Counsel for Debtors and Debtors in Possession

-AND-

QUINN EMANUEL URQUHART
OLIVER & HEDGES LLP
Susheel Kirpalani
James C. Tecce
51 Madison Avenue
New York, New York 10010
Telephone: (212) 849-7000

Proposed Counsel for Debtors and
Debtors in Possession