## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------------------x

In re:

AMERICAN HOME MORTGAGE HOLDINGS, INC., *et al.*,

    Debtors.

: Chapter 11
: Case No. 07-11047 (CSS)
: (Jointly Administered)
:
:
:
:

------------------------------------------------------------------------x

CREDIT SUISSE FIRST BOSTON MORTGAGE CAPITAL, LLC

    Plaintiff and Counterclaim-Defendant,

v.

AMERICAN HOME MORTGAGE CORP., AMERICAN HOME MORTGAGE ACCEPTANCE, INC., AMERICAN HOME MORTGAGE SERVICING, INC., AMERICAN HOME MORTGAGE INVESTMENT CORP., and AMERICAN HOME MORTGAGE HOLDINGS, INC.,

    Debtor-Defendants and Counterclaim-Plaintiffs.

: Adversary Proceeding
: Case No. 07-51684 (CSS)
:
:
:
:
:
:
:
:
:
:

------------------------------------------------------------------------x

CALYON NEW YORK BRANCH,

    Plaintiff and Counterclaim-Defendant,

v.

AMERICAN HOME MORTGAGE CORP., AMERICAN HOME MORTGAGE SERVICING, INC., AMERICAN HOME MORTGAGE INVESTMENT CORP.,

    Debtor-Defendants and Counterclaim-Plaintiffs.

: Adversary Proceeding
: Case No. 07-51704 (CSS)
:
:
:
:
:
:

------------------------------------------------------------------------x

## PRETRIAL MEMORANDUM OF DEBTOR-DEFENDANTS
## AND COUNTERCLAIM-PLAINTIFFS

**UN-REDACTED VERSION**

# TABLE OF CONTENTS

I. ISSUES FOR DETERMINATION ................................................................... 1

II. LEGAL FRAMEWORK ............................................................................. 5

    A. LIQUIDITY, SUBSTITUTABILITY, AND ALIENABILITY ARE SINE QUA NON OF REPURCHASE AGREEMENTS ........................................................................ 5

    B. WAREHOUSE LENDER AGREEMENTS LACK ALL INDICIA OF REPURCHASE AGREEMENTS DEVELOPED BY MARKET PARTICIPANTS ......................................... 6

    C. THIRD CIRCUIT DECREES REPRESENTATIONS CONCERNING "INTENT OF THE PARTIES" ARE IRRELEVANT TO RE-CHARACTERIZATION ANALYSIS ...................... 8

    D. SECTIONS 101(47)(A)(IV) AND 741(7)(A)(VIII) EXCLUDE SERVICING FROM "REPURCHASE AGREEMENT" AND "SECURITIES CONTRACT" DEFINITIONS AND SAFE HARBORS IN SECTIONS 555 AND 559 OF BANKRUPTCY CODE ...................... 9

    E. WAREHOUSE LENDERS ARE NOT ENTITLED TO INJUNCTIVE RELIEF WHEN AMERICAN HOME'S ALLEGED FAILURE TO SURRENDER SERVICING GIVES RISE TO DISCHARGEABLE BANKRUPTCY CLAIMS ............................................................ 11

III. AMERICAN HOME WILL PRESENT EVIDENCE DEMONSTRATING WAREHOUSE LENDING AGREEMENTS ARE DISGUISED SECURED FINANCINGS ..................................................................................... 13

    A. WAREHOUSE LENDERS' AGREEMENTS LACK HALLMARKS OF TRUE REPURCHASE AGREEMENTS AND INSTEAD ARE REPLETE WITH TERMS AND CONDITIONS FOUND IN SECURED FINANCING AGREEMENTS ............................................................ 13

        1. CALYON AGREEMENT: A RUSHED "CUT AND PASTE" THAT FOLLOWS NEITHER MODEL BMA FORM NOR CALYON'S OWN CAPITAL MARKETS DOCUMENTATION POLICIES AND PROCEDURES ........................................... 13

        2. CSFB AGREEMENT: INCORPORATES TERMS FROM BOFA FACILITY ......... 17

    B. OPERATIONAL & COURSE OF DEALING EVIDENCE DEMONSTRATES TRANSACTIONS SUBSTANTIVELY ARE SECURED LOANS ................................................................ 21

        1. CALYON AGREEMENT: TRANSACTIONS UNDER REPURCHASE AGREEMENT AND LOAN AGREEMENT ARE THE SAME MECHANICALLY AND OPERATIONALLY ...................................................................................... 21

        2. CSFB AGREEMENT: CONSISTENT WITH OVERALL OBJECTIVE OF RE-HYPOTHECATING MORTGAGE LOANS TO CSFB AFFILIATES, SALES OF MORTGAGE LOANS TO THIRD PARTIES WERE NOT ATTEMPTED .............. 22

DB02:6345651.1

064657.1001

# I.   ISSUES FOR DETERMINATION

*Secured Loans Are Not Entitled To Safe Harbor Protections Simply Because The Parties Style Them "Repurchase Agreements."* On the question of re-characterization, the discrete issue for the Court's consideration is whether Congress intended to elevate form over substance and afford "safe harbor" protections to disguised secured financing transactions because the parties conveniently ascribed the sobriquet "repurchase" to their agreement. The analysis of whether the safe harbor provisions apply depends not on the empty nomenclature appearing in an agreement's title -- or even appearing in its operative provisions -- but in the substance of the transaction effectuated by that agreement. Nor do representations and warranties concerning "the intent of the parties" have any bearing on this analysis when the Third Circuit expressly recognizes both the import of economic substance and the irrelevance of self-serving statements of intent in the recharacterization context. The result CSFB and Calyon (the "Warehouse Lenders") envision will enable secured financings to receive protections intended for transactions that substantively are entirely different through simple acts of paper entrepreneurialism.

*Congress Designed Safe Harbor To Ensure Liquidity With Respect To Purchased Assets -- But Warehouse Lenders' Agreements Lack These Features.* Neither the CSFB Agreement nor the Calyon Agreement consummates the typical repurchase transaction that the Bankruptcy Code's safe harbor is designed to protect. As the Third Circuit has recognized, Congress crafted those exceptions to the automatic stay to avoid any "ripple effects" through financial markets that might be occasioned by the filing of a single repurchase agreement participant. Recognizing repurchase transactions are interrelated -- because each repurchase agreement participant, in turn, promptly sells the purchased assets to a third-party -- the safe

1

harbor provisions serve to ensure that the bankruptcy filing of a single repurchase transaction participant will not impede the ability of the myriad other participants to promptly liquidate their underlying assets in order to meet their obligations to the other counterparties.

Neither of the Warehouse Lenders' agreements own up to that ideal, instead containing provisions restricting their ability to promptly sell the purportedly purchased assets (i.e., the whole mortgage loans). The Warehouse Lenders' agreements also contain provisions illustrating the transactions they consummate, in economic substance, constitute disguised secured loans:

- *No Liquidity, Alienability Or Substitutability*. Under both agreements, the purportedly purchased mortgage loans actually served as "pledged collateral." Both restrict the Warehouse Lenders' ability to freely alienate the assets, and neither authorizes the Warehouse Lenders (a) to return "substitute" or "equivalent" assets -- a feature provided for expressly in the Model BMA Form,[1] or (b) to expressly *sell* the assets. The Calyon Agreement provides the lender's ability to pledge or hypothecate the underlying assets at all times remains subject to the its obligation to return the identical assets it supposedly purchased. The CSFB Agreement only expressly authorizes the lender to sell the assets in an event of default. Not surprisingly, CSFB never sold the mortgage loans to a third-party, instead engaging in a series of internal transactions with certain CSFB branches -- subject at all times to CSFB's obligation to return to American Home the identical mortgage loans it purportedly purchased.[2]

- *Price Differential Relates To Borrower Risk*. Under both Warehouse Lenders' agreements, the "price differential" (or "imputed interest" on the underlying loan) bears no relationship to the interest paid on the mortgage loans. Consistent with secured financings, the price differential is a function of American Home's credit risk and the quality of the underlying collateral (i.e., fluctuating depending on the mortgage loans' condition, whether, and the extent to which the homeowners are delinquent, how "aged" the loans are, etc.).

---

[1]     Bond Market Association TBMA/ISMA Global Master Repurchase Agreement (2000 Version) (the "Model BMA Form").

[2]     In addition to the Model BMA Form, the text of the statute supports various courts' interpretation of the safe harbor provisions to require alienability and substitutability: "The term *repurchase* agreement ... (A) means -- (i) an agreement ... which provides for the transfer of one or more ... mortgage loans ... against the transfer of funds by the transferee of such ... mortgage loans ... with a simultaneous agreement by such transferee to transfer to the transferor thereof ... mortgage loans, *or interest of the kind as described in this clause*, at a date certain not later than 1 year after such transfer or on demand, against the transfer of funds") (emphasis added).

2

- ***Sellers' Ability To Realize Interest Income From Underlying Mortgage Loans.***
  Notwithstanding the purported "sale" of the mortgage loans to the Warehouse
  Lenders, under both agreements, American Home retained an interest in the
  income generated by the mortgage loans.

- ***Financial Covenants.*** Both Warehouse Lending agreements find all or a portion
  of their genesis in secured loan agreements. Calyon previously was party to a
  secured loan agreement with American Home (the "Calyon Loan"). Pressed for
  time to document a purported "repurchase agreement," Calyon declined to follow
  (a) the suggestion of American Home's counsel to use the form of repurchase
  agreements developed by market participants (e.g., the Model BMA Form) and
  (b) its own internal procedures dictating that the Model BMA Form should be
  used to document these transactions. Instead, Calyon hastily "cut and paste" the
  terms used in section 559 of the Bankruptcy Code (i.e., "purchase" and
  "repurchase") into the Calyon Loan Agreement. Operationally, the agreement
  remained exactly the same and continued to function as a secured loan. Similarly,
  CSFB did not follow the Model BMA Form but rather a form "repurchase
  agreement" it developed internally. Still, at American Home's request, the
  "borrowing and guaranteeing" entities (CSFB's terms) were structured in the same
  manner as American Home's secured lending facility with Bank of America (the
  "BofA Facility"), and the covenants from the BofA Facility were inserted into the
  CSFB Agreement.

- ***Course Of Dealing.*** The Warehouse Lenders' conduct with respect to these
  agreements -- including use of terms such as "borrowing entities," internal
  references to "loans," and discussions concerning "realization of our collateral" --
  confirms they were disguised secured financings.

***Servicing Is Not "An Interest In Mortgage Loans" And As Such Is Not Included In***

***The Safe Harbors.*** The Warehouse Lenders likely will argue the servicing provisions of the

CSFB and Calyon Agreements fall within the safe harbors of sections 555 and 559 of the

Bankruptcy Code because of the references in sections 101(47)(a)(i) and 741(7)(A)(i) of the

Bankruptcy Code to "interests in mortgage loans." Servicing, however, is not an "interest" in a

mortgage loan. Indeed, the text of section 541(d) of the Bankruptcy Code indicates that

"servicing" is entirely separate from "an interest in a mortgage."[3] While participation interests or

---

[3] See 11 U.S.C. § 541(d) ("Property in which the debtor holds, as of the commencement of the
case, only legal title and not an equitable interest, such as a mortgage secured by real property, ***or
an interest in such mortgage,*** sold by the debtor but as to which the debtor retains legal title ***to
service or supervise the servicing of*** such mortgage ***or interest*** becomes property of the estate
....") (emphasis added). Stated differently, in referring to servicing ***both*** mortgages ***and interests
in mortgages,*** section 541(d) makes it clear that the term "interests in mortgages does not mean
servicing.

pass-through securities representing a pool of mortgages might constitute an "interest in mortgage loans," servicing does not. Instead, it is an entirely separate, severable provision from the loan agreements. Because neither the "repurchase agreement" definition nor the "securities contract" provision includes servicing,[4] the automatic stay applies.

*Warehouse Lenders Are Not Entitled To Specific Performance.* The Warehouse Lenders cannot avoid the inevitable conversion of their servicing-related claims into "bankruptcy claims" subject to discharge in chapter 11. Their rights with respect to servicing (and any damages caused by the automatic stay's application to servicing) give rise to nothing more than a "right of payment" -- not entitlement to equitable relief or specific performance. The Warehouse Lenders' exclusive remedy for damages incurred as a consequence of American Home's failure (if any) to surrender servicing upon its bankruptcy filing is a claim in the bankruptcy cases.

*The Sky Is Not Falling.* The relief American Home requests will not have the deleterious effects on capital markets predicted by the Warehouse Lenders (and others who have appeared in the proceeding). American Home does not maintain any and all repurchase agreements relating to mortgage loans fall outside the safe harbor. Instead, secured financing transactions collateralized by whole mortgage loans -- where the parties neither could, nor did

---

[4]     See 11 U.S.C. § 101(47)(a)(iv) ("[The term 'repurchase agreement' means] a master agreement that provides for an agreement or transaction referred to in clause (i) … without regard to whether such master agreement provides for an agreement or transaction that is not a repurchase agreement under this paragraph, *except that such master agreement shall be considered to be a repurchase agreement under this paragraph only with respect to each agreement or transaction under the master agreement that is referred to in clause (i)*") (emphasis added); 11 U.S.C. § 741(7)(A)(i) ("'securities contract' means (i) a contract for the purchase, sale, or loan of a … mortgage loan … a group of … mortgage loans …"); 11 U.S.C. § 741(7)(A)(viii) ("'securities contract' means …. (viii) a master agreement that provides for an agreement or transaction referred to in clause (i) … without regard to whether the master agreement provides for an agreement or transaction that is not a securities contract under this subparagraph, *except that such mater agreement shall be considered to be a securities contract under this subparagraph only with respect to each agreement or transaction under such mater agreement that is referred to in clause (i) …*") (emphasis added). Neither section 101(47)(a)(i) nor section 741(7)(A)(i) references servicing rights.

sell the underlying loans to third parties in an exponential series of repurchase transactions -- do not fall within the exceptions to the automatic stay found in sections 555 and 559 of the Bankruptcy Code. Similarly, servicing, which does not fall within the "repurchase agreement" or "securities contract" definitions in any event, will remain subject to (a) the automatic stay and (b) the counterparties' rights to assert bankruptcy claims should they suffer damages by a debtor's failure to surrender its servicing. At bottom, transactions that substantively constitute true repurchase agreements or securities contracts will not be impacted.

## II.  LEGAL FRAMEWORK

### A.  Liquidity, Substitutability, And Alienability Are *Sine Qua Non* Of Repurchase Agreements

The common thread (and indeed, requirement) present in repurchase agreements is the buyer's ability to promptly sell or liquidate the securities that are the subject of the repurchase agreement (or the purportedly "purchased assets"). See Bevill, Bresler & Schulman v. Spenser Sav. Ass'n, 878 F.2d 742, 746 (3d Cir. 1989) (noting "*[t]he common element in all these extensive uses of repo agreements is liquidity. Without that characteristic, the repo agreement would not serve the function that it now does*") (emphasis added).[5] Congress designed section 559 of the Bankruptcy Code to preserve market liquidity. If the repo buyer cannot promptly transfer the purchased assets to a third party upon its purchase of those assets from the seller, the purposes of the safe harbor are lost. Instead, the transaction more closely resembles a collateral pledge (and hence a secured financing). As the Third Circuit noted:

---

[5]  See also In re Granite Partners, LP, 17 F. Supp. 2d 275, 298 (S.D.N.Y. 1998) ("*[T]he repo buyers unrestricted right to trade the securities during the term of the agreement represents an incident of ownership that does not pass to the secured lender in a collateralized transaction*") (emphasis added) (citations omitted).

The repo market is used by the Federal Reserve System to help execute monetary policy, and serves to finance the national debt at the lowest possible cost .... Primary dealers act in effect as first-tier underwriters of new issuances of U.S. Treasury securities .... [and] they finance a major portion of their purchases by selling the securities under repos to secondary dealers ... who in turn finance their purchases by selling the securities under repos to institutional and other customers ....

Congress came to the decision that the effective functioning of the repo market can only be assured if repo investors will be protected against open-ended market loss arising from the insolvency of a dealer or other counter-party in the repo market. The repo market is as complex as it is critical. It is built upon transactions that are highly interrelated. A collapse of one institution involved in a repo transaction could start a chain reaction, putting at risk hundreds of billions of dollars and threatening the solvency of many additional institutions ....

Congress, the Board of Governors of the Federal Reserve, the Public Securities Association, the Investment Company Institute and others were concerned that ... the failure of one repo dealer, and the consequent inability of repo participants to promptly liquidate their investments to obtain cash to meet obligations, could have a ripple effect through the country's financial markets, causing an otherwise isolated financial problem to spread to many other entities .... *The certainty and fluidity needed by professionals on both sides of the transactions is of such importance that one debtor's filing of a petition should not be permitted to impair the functioning of the market as a result of the Code's automatic stay, or have the integrity of contract relationships upset by the Code's avoidance provisions.* Congress determined to correct these 'uncertainties' by amending the Code to 'ensure there is no question that repo participants are afforded the same treatment with respect to the stay ....'

Bevill, 878 F.2d at 745-48 (emphasis added) (citations omitted).[6]

### B. Warehouse Lender Agreements Lack All Indicia Of Repurchase Agreements Developed By Market Participants

Given the significance of "liquidity," agreements restricting, either expressly or impliedly, the purchaser's ability to sell the purchased assets are not true repurchase agreements intended for section 559's protections and instead, in substance, are secured financings. Such provisions include:

---

[6] See also Granite Partners, 17 F. Supp. 2d at 298 ("*[R]epo transactions contribute significantly to the debt and liquidity of the secondary market for Treasury securities .... The mobility of repo securities is what makes them a key tool of the funding markets, enabling dealers to continuously convert their securities inventory to cash to use to finance the purchase of yet additional securities and thereby make markets*") (emphasis added).

- A requirement that the purchaser return (or the buyer "repurchase") *identical* assets (as opposed to simply *equivalent* or *substituted* assets);[7]

- The absence of language expressly authorizing the purchaser to "sell" the purchased assets (as opposed to simply authorizing the purchaser to "transfer" the purchased assets);[8] and

- Servicing provisions that are severable from the underlying agreement and that impede the purchaser's ability to sell the underlying mortgages (e.g., where the buyer cannot replace the servicer or transfer the servicing rights).

In addition to alienability factors, courts also have examined:

- Whether the imputed interest rate bears any relation to the rate payable on the underlying security or mortgage (if not, it suggests the incurrence of a loan tied to the purported seller (or borrowers) credit risk);[9] and

- The seller's retention of an ownership interest in income generated by the purportedly purchased assets (suggesting it has the ultimate ownership in the purportedly purchased assets).[10]

---

[7] See, e.g., In re Criimi Mae, Inc., 251 B.R. 796, 804 (Bankr. D. Md. 2000) (noting "*the seemingly absolute transfer ... is limited by the absolute duty of the Buyer to produce back to the Seller the exact same securities upon termination of the transaction*") (emphasis added).

[8] See In re Granite Partners, LP, 17 F. Supp. 2d at 301 (noting "a most significant difference between repos and standard collateralized loans. In the latter transaction, the lender holds pledged collateral for security *and may not sell it in the absence of a default. In a contract repo, 'lenders' take title to the securities received and can trade, sell or pledge them*") (citations omitted) (emphasis added).

[9] See Resolution Trust Corp. v. Aetna Cas. & Sur. Co., 25 F.3d 570, 578 (7th Cir. 1994) (finding repurchase agreement constituted secured financing when, among other things, "the rate of interest on the repos and reverse repos has no relation to the interest rate on the underlying security"); Bevill, Bresler & Schulman Asset Mgmt. Corp. v. Cohen, 67 B.R. 557, 588 (D.N.J. 1986) (noting "interest rate is a market rate that bears no relation to the interest rate of the underlying security").

[10] See, e.g., In re Criimi Mae, Inc., 251 B.R. at 804 (noting "if the Seller defaults, all income paid after the default shall be retained by the Buyer. This may imply that a right to income remains in the Seller until default, when it shifts to the Buyer. *Such a retention of right to income until default is more consistent with a loan transaction than an absolute purchase*") (emphasis added).

DB02:6345651.1 064657.1001

The Model BMA Form contains these provisions: (1) the "buyer" is expressly authorized to return "substitute" assets;[11] (2) income from the underlying assets clearly belongs to the buyer,[12] and the buyer does not "commit" to enter into a repurchase transaction (unlike a lender, which commits to fund (and is compensated for that commitment with a "commitment fee")).[13] As set forth below, neither the (i) Repurchase Agreement among American Home and Calyon New York Branch ("Calyon") (the "Calyon Agreement") nor (ii) the Master Repurchase Agreement among American Home and Credit Suisse First Boston Mortgage Capital LLC (the "CSFB Agreement") follows the Model BMA form or contains provisions which are the hallmark of true repurchase agreements.

### C. Third Circuit Decrees Representations Concerning "Intent Of The Parties" Are Irrelevant To Re-Characterization Analysis

In re-characterizing a lease as a "true sale"/ secured financing, In re Pillowtex, Inc., 349 F.3d 711 (3d Cir. 2004) adopted the Judge Walsh's view concerning the irrelevance of statements of intent: "*I am persuaded by the clear weight of authority that the intent of the parties, no matter how clearly spelled out in the parties' representations within the agreement, can not*

---

[11]  See Model BMA Form (AHM-Calyon 536942-536984) § 1(a) ("From time to time the parties hereto may enter into transactions in which one party ... ('Seller') agrees to sell to the other ... 'Buyer' securities ... against the payment of the purchase price by Buyer to Seller, *with a simultaneous agreement by Buyer to sell to Seller Securities equivalent to such Securities at a date certain* ...) (emphasis added); § 1(a); § 2(s)-(t) ("Equivalent Securities" means securities "(i) of the same issuer; (ii) part of the same issue; and (iii) of an identical type, nominal value, description and ... amount as those other Securities") § 3(f) ("On the Repurchase Date, Buyer shall transfer to seller or its agent Equivalent Securities against the payment of the Repurchase Price by Seller ...").

[12]  See Model BMA Form (AHM-Calyon 536942-536984) § 5(i) ("Buyer shall on the date such Income is paid by the seller transfer to or credit to the account of Seller an amount equal to (and in the same currency as) the amount paid by the issuer").

[13]  Compare Model BMA Form § 1(a) ("From time to time the parties hereto may enter into transactions"), with, CSFB Agreement § 3 ("This agreement is a commitment by Buyer to enter into Transactions with the Sellers ..."); Calyon Agreement (§ 2.1) (the Banks "shall" make purchases). A chart comparing certain provisions from the Model BMA Form with the CSFB Agreement and the Calyon Agreement is attached hereto as Exhibit A.

*control the issue of whether the agreement constitutes a true lease or a security agreement.'*
*Judge Walsh observed that the shift away from intent had been remarked upon by various*
*commentators."* Id. at 722 (emphasis added).[14] Pillowtext rejected the argument that the

Uniform Commercial Code looks to "intent of the parties" in determining whether a lease

constitutes a secured financing, noting "the 1992 version of the § 1-207(37) directed courts to

determine 'whether a lease *is intended* as security ... this language was amended in 1995 to read

'whether the transaction *creates* a lease or security interest.' In this way, the reference to parties'

intent was explicitly omitted." Id. at 721 (emphasis in original).

Similarly, Article 9 of the Uniform Commercial Code, governing secured transactions,

since has been amended to explicitly delete references to parties' intent in its scope provisions.

Stated differently, the parties' intent has no bearing on whether a transaction constitutes a secured

financing that is subject to Article 9.[15]

### D. Sections 101(47)(a)(iv) And 741(7)(A)(viii) Exclude Servicing From "Repurchase Agreement" And "Securities Contract" Definitions And Safe Harbors In Sections 555 And 559 Of Bankruptcy Code

Both section 101(47)(a)(iv) and section 741(7)(a)(viii) exclude from the "repurchase

agreement" and "securities contract" definitions those transactions which, themselves, are not

agreements for the sale and repurchase of mortgages. Neither "servicing," nor agreements for

the sale and repurchase of servicing, are mentioned in either section 101(47)(a)(i) or section

---

[14]    Other courts have reached this conclusion. See RTC v. Aetna Cas. & Sur. Co., 25 F.3d at 578 (examining repo in insurance context: "[w]hether a particular repurchase transaction is in economic substance more like a sale or more like a loan *depends on the structure of that transaction*") (emphasis added) (citation omitted); In re County of Orange, 31 F. Supp. 2d 768, 778 & n.17 (C.D. Cal. 1998) (refusing to find intent of parties governs whether contract is repo or loan; examining whether repos violated California statute limiting indebtedness).

[15]    Former § 9-102(a)(1) of the U.C.C. provided that Article 9 applies to transactions which are "intended to create a security interest." That provision since has been replaced in Revised Article 9 with § 9-109(a): "this article applies to: (1) a transaction, *regardless of its form*, that creates a security interest in personal property ...." (emphasis added). See also Official Comment 2 to § 9-109 ("*When a security interest is created, this Article applies regardless of the form of the transaction or the name that parties give to it*") (emphasis added).

741(7)(a)(viii). Moreover, the servicing provisions clearly are "severable" from the Warehouse Lenders' agreements, considering that, inter alia (a) the nature and purpose of a mortgage loan (i.e., the extension of funds secured by real property) are different from the rights to "service" that loan, which entails, inter alia, monitoring the loan and collecting principal and interest payments, (b) servicing consideration (if any)[16] could be apportioned from the other consideration flowing under the agreements (e.g., the price differentials), and (c) servicing involves a separate American Home entity (i.e., American Home Mortgage Servicing, Inc.).[17]

Nor can the Warehouse Lenders argue "servicing" constitutes an "interest in mortgage loans" for purposes of section 101(47)(a) or section 741(7). The text in section 541(d) of the Bankruptcy Code confirms this conclusion by treating "servicing" separately from "an interest in

---

[16]    While separate consideration was not paid to American Home under the CSFB Agreement for servicing, this further demonstrates American Home's ownership of the underlying mortgage loans (and its interest in ensuring that the value of its property was preserved). American Home was prepared to perform servicing free of charge to ensure it could maintain the mortgage loans' value.

[17]    Stewart Title Guar. Co. v. Old Republic Nat'l Ins. Co., 83 F.3d 735, 739-40 (5th Cir. 1996) (finding single lease allowing title company to lease an abstract plant and make use of records contained therein and, upon lease termination, copy all property records, was severable into two separate agreements when parties intended to create two agreements; two agreements encompassed different subject matter; and parties' conduct, specifically method of payment, suggested implied consideration apportionment); Byrd v. Gardinier, Inc. (In re Gardinier), 831 F.2d 974, 976 (11th Cir. 1987) (single real estate contract that contained provision for brokerage fee was severable into two contracts, one for sale of land and one for brokerage fee when terms of instrument revealed intent to create two contracts: nature and purpose of contracts were different, there was no consideration flowing between broker and buyer; and obligations were not interrelated); In re Adelphia Business Solutions, Inc., 322 B.R. 51, 59-60 (Bankr. S.D.N.Y. 2005) (finding two leases, executed on the same date, by same parties, relating to same building, and containing cross-default provisions, were severable when, inter alia, leases pertained to different subject matters and each premise was uniquely described in each lease; leases ran for different terms; rent for each space was accepted separately; and consideration was apportioned among leases); Integrated Health Servs., Inc., 2000 WL 33712484 (Bankr. D. Del. July 7, 2000) (executive non-compete agreement was severable from leases executed on same day when consideration supporting each agreement was apportionable (monthly lease payment versus yearly executive salary) -- notwithstanding reference to non-compete payments in leases and debtors' agreement to pay rental reductions over to executive; agreements covered different subject matter; agreements had different "objectives;" and evidence of intent to enter into separate agreements was "manifested by the fact that each agreement obligates separate parties").

a mortgage." Since section 541(d) refers to *servicing both* mortgages and *interests in mortgages*, then servicing itself cannot be an "interest in mortgages." If servicing were in interest in mortgages, then section 541(d) would be referring to "servicing interests in servicing" -- an absurd reading. Similarly, the "interests in mortgage loans" referred to in sections 101(47) and 741(7) of the Bankruptcy Code cannot be read to include servicing. See, e.g., Sikiraica v. Nationwide Ins. Co., 416 F.3d 214, 223 (3d Cir. 2005) ("Statutes must be construed as a symmetrical and coherent regulatory scheme, one in which the operative words have a consistent meaning throughout") (citations omitted). Cf., Cohen v. de la Cruz, 523 U.S. 213, 220 (1998) (recognizing "the presumption that equivalent words have equivalent meaning when repeated in the same statute").

### E. Warehouse Lenders Are Not Entitled To Injunctive Relief When American Home's Alleged Failure To Surrender Servicing Gives Rise To Dischargeable Bankruptcy Claims

The economic injuries the Warehouse Lenders allege stem from American Home's failure to surrender servicing do not give rise to any entitlement for injunctive relief or specific performance. At best, they give rise to a "right to payment," the remedy for which is a dischargeable claim in American Home's bankruptcy cases. Ultimately, some amount of money could make the Warehouse Lenders whole for any harm they may suffer as a result of American Home's alleged failure to surrender servicing. Specific performance therefore is not warranted. See, e.g., Air Line Pilots Ass'n v. Continental Airlines (In re Continental Airlines), 125 F.3d 120, 131-36 (3d Cir. 1997) (rejecting argument that request for equitable remedy of seniority integration into collective bargaining agreement (i.e., to be placed on seniority hiring list) could not be converted into claim for monetary damages: "the right to seniority integration gives rise to a 'right of payment' such that the remedy constitutes a 'claim' dischargeable in bankruptcy"), Frank's GMC Truck Center, Inc. v. General Motors Corp., 847 F.2d 100, 102 (3d. Cir. 1988)

11

("The availability of adequate monetary damages belies a claim of irreparable injury"); <u>Morton v. Beyer</u>, 822 F.2d 364, 372 (3d Cir. 1987) (reversing district court's grant of preliminary injunction where plaintiff's claimed injury was "purely economic in nature and thus compensable in money"); <u>In re Dairy Mart Convenience Stores, Inc.</u>, 272 B.R. 66, 72 (S.D.N.Y. 2002) (counterparty to breach of contract lawsuit obtained prejudgment remedy requiring debtor to maintain letter of credit to satisfy any judgment it obtained; upon debtor's bankruptcy filing, bankruptcy court denied request for specific performance directing debtor to renew letter of credit; affirming bankruptcy court decision because alternative result (requiring renewal of letter of credit) would constitute post-petition preference), <u>aff'd</u>, 351 F.3d 86 (2d Cir. 2003); <u>In re A.J. Lane & Co., Inc.</u>, 115 B.R. 738, 741 (Bankr. D. Mass. 1990) (rejecting request to require debtor to renew prejudgment remedy when debtor's "obligation to do so has been transformed through the bankruptcy filing from one which may have been specifically enforceable to a monetary claim which is both allowable and dischargeable in this Chapter 11 proceeding"). Moreover, American Home's right to service mortgage loans is property of the estate, considering that the Warehouse Lenders maintain that right terminated upon the alleged event of default occasioned by American Home's bankruptcy filing.[18]

---

[18]     <u>See, e.g.</u>, 11 U.S.C. § 541(c) ("an interest of the debtor becomes property of the estate ... notwithstanding any provision in an agreement ... (B) that is conditioned on the insolvency or financial condition of the debtor, [or] on the commencement of a case under this title ... and that effects or gives an option to effect a forfeiture, modification, or termination of the debtor's interest in property").

## III. AMERICAN HOME WILL PRESENT EVIDENCE DEMONSTRATING WAREHOUSE LENDING AGREEMENTS ARE DISGUISED SECURED FINANCINGS

### A. Warehouse Lenders' Agreements Lack Hallmarks Of True Repurchase Agreements And Instead Are Replete With Terms And Conditions Found In Secured Financing Agreements

#### 1. Calyon Agreement: A Rushed "Cut And Paste" That Follows Neither Model BMA Form Nor Calyon's Own Capital Markets Documentation Policies And Procedures

The Calyon Agreement requires that the very same mortgage loans American Home purportedly "sold" to the lenders must be re-sold by the lenders to American Home at the conclusion of the transaction.[19] As such, the mortgage loans cannot be sold to a third party once "purchased" by the lenders in true repurchase agreement fashion. Moreover, absent an Event of Default, the lenders' ability to replace the existing servicer (American Home) is restricted, further impeding its ability to sell the mortgage loans.[20]

---

[19] See § 2.23(d) (AHM-Calyon 535953) ("The Administrative Agent, on behalf of the Purchasers, shall have free and unrestricted *use* of all Mortgage Loans, and nothing in this Repurchase Agreement shall preclude the Administrative Agent ... from engaging in any repurchase transactions with the Mortgage Loans or otherwise pledging, repledging, transferring, hypothecating or rehypothecating the Mortgage Loans, on terms, and subject to conditions, within the Administrative Agent, on behalf of the Purchaser's absolute discretion, *in all cases subject to the Purchasers' obligation to reconvey the Mortgage Loans on the Repurchase Date ...*") (emphasis added); (AHM-CALYON 535922) ("Mortgage Loan means a loan evidenced by a Mortgage Note and secured by a Mortgage, which Mortgage Loan has been acquired by the Purchases from any of the Sellers by purchase pursuant to this Agreement ..."). See also Tr., Deposition Of Alan Sidrane ("Sidrane Tr.") at 59:20-22 ("[Q] Was Calyon obligated to reconvey the same home loans that it purchased? [A] I believe that's correct"); at 59:25-60:4 ("*[Q] Did Calyon have the right to substitute those home loans for some other home loans? [A] I believe the answer is no*") (emphasis added); Tr., Deposition of Sam Pilcer ("Pilcer Tr.") at 130:10-131:2 ("[Q] Was Calyon obligated to sell back to American Home the same mortgages that it purchased in the first part of the repo agreement? [A] I believe it was .... *[A] My understanding is that in general, you're supposed to sell back the identical assets that were sold to you, especially under residential mortgage transactions*") (emphasis added). Copies of the relevant portions of the transcripts referred to herein are attached hereto as Exhibit F.

[20] See Calyon Agreement § 11.1 (AHM-Calyon 535989) ("Until the Administrative Agent gives notice to the Sellers of the designation of a new Servicer *after the occurrence of a Default or an Event of Default* .... [American Home] is hereby designated as ... the Servicer pursuant to the terms hereof") (emphasis added). Absent a Servicer Default, American Home was appointed as Servicer and could, with the consent of the Majority Banks (as defined therein) which "shall not

The agreement is at best ambiguous on the issue of whether American Home retains an ownership interest in the income generated by the mortgage loans. Several provisions suggest American Home is entitled to that income.[21] Other features characteristic of a secured loan include (i) calculation of the "price differential" without regard to the income generated by the underlying assets but instead with reference to the "credit risk" American Home presented, and the quality of the pledged collateral;[22] (2) extensive affirmative and negative covenants, including "yank a bank" provisions found in secured loan agreements;[23] and (3) "conditions"

---

be unreasonably withheld or delayed ... subcontract with any other person for the servicing, administration, or collection of the Mortgaged Assets." Id.

[21] See Calyon Agreement § 2.5(a)(iii) (AHM-Calyon 535937) ("It is understood and agreed that, unless and until a Default or an Event of Default shall have occurred ... *the applicable Seller shall be entitled to the proceeds of all Purchased Mortgage Loans subject to Purchases outstanding hereunder subject to Margin Maintenance*") (emphasis added); § 2.7(c)(ii) (proceeds are collected by the Servicer and paid into the "Collection Account"); § 2.8(e)(ii) (excess funds in Collection Account can be distributed to Sellers); § 2.7(c)(iv)(E) (Collection Account funds may be used to pay "an amount equal to the unpaid Repurchase Price for each Transaction, or such lesser amount as is available from Collections ... to the applicable Managing Agent's Account"); § 3.3(a) (AHM-Calyon 535937). But see § 2.7(b) (AHM-Calyon 535939) ("The Sellers shall establish and maintain an account (the 'Collection Account') with the Collection Account Bank. The Collection Account shall be a fully segregated trust account .... [and] shall be under the control of the Administrative Agent .... [T]he Sellers have no right to withdraw any amount from the Collection Account until the Repurchase Obligations are indefeasibly paid in full").

[22] See Calyon Agreement § 1.1 (AHM-Calyon 535924) (stating "Price Differential" is "the aggregate amount obtained by daily application of the Pricing Rate ..."); § 1.1 (AHM-Calyon 535924) (stating "Pricing Rate" is "either (i) the Commercial Paper Rate, (ii) the Eurodollar Rate plus Bank Margin or (iii) the Alternate Base Rate, as applicable and as determined in accordance with Sections 2.9 and 2.10 ..."). See also Tr., Deposition Of Mark H. Adelson ("Adelson Tr.") at 135:15-21 ("*[Q] Do you have an understanding under this agreement as to whether or not there is a relationship between the price differential and the interest that's paid on the underlying mortgage loan? [A] There is not. It doesn't go off that*") (emphasis added).

[23] See, e.g., Article VI (Affirmative Covenants) and Article VII (Negative Covenants) §§ 6.1, 6.6, 6.7, 6.9, 7.1, 7.16, 7.17, 7.18 (AHM-Calyon 535970-80) ((i) requiring the maintenance of "Minimum Tangible Net Worth" and "Collateral Value to Adjusted Consolidated Funded Debt Ratio;" (ii) demanding notice of material litigation or Material Adverse Effects; (iii) prohibiting material changes to corporate structure, e.g., mergers and acquisitions; (iv) requiring minimum insurance levels; (v) directing that the American Home Parties provide financial statements and reports; and (vi) requiring that the Sellers and Servicers keep books of records and account); § 2.20(a) (AHM-Calyon 535951) (authorizing American Home to replace (or "yank") the existing banks in certain instances).

precedent to funding as well as "commitments" to fund.[24]

The striking similarity between the Calyon Agreement and standard secured financings (including the Calyon Loan) is not surprising considering the circumstances surrounding its drafting. Rushing for time to meet a deadline, Calyon's counsel declined to follow American Home's counsel's suggestion to use a "traditional" form of repurchase agreement, and instead opted to simply modify the old loan agreement into a "repurchase agreement" by including the Bankruptcy Code's nomenclature. As Calyon's counsel advised:

> We will be circulating a new draft of the repurchase agreement in the morning …. [W]e have made changes at the request of our bankruptcy lawyers in connection with our giving the safe harbor opinion. *As you know, [American Home's counsel] proposed making radical changes to the agreement (including, perhaps, starting over with a more traditional repo form, rather than the agreement we have, which admittedly is our old loan agreement converted into a repo, which we did to facilitate review by the parties) in order to give the opinion.* We weren't going to be able to do that and still close on Monday, so when Marissa [Morelle, American Home] called me about this mid-day on Friday, I asked my bankruptcy partners to jump in and see what they would require to give an opinion …. I think you will agree that the changes that our bankruptcy lawyers are proposing are not radical. The main changes made for this purpose include a new definition of 'Mortgage Loan' and changes to Sections 2.23, 3.3 and Article 8 …. *I do not think that these changes to the document will require operational modifications* ….[25]

Ultimately, the Hunton & Williams opinion letter hedged against the possibility of re-characterization. The first draft of the letter stated in three separate places that the Calyon Agreement was not a "standard repurchase agreement" and did not follow the market norm. The second (final) draft scaled back this statement, but only slightly.[26]

---

[24]   See, e.g., § 4.2(d) (AHM-Calyon 535963) (stating "Conditions Precedent" to the Lenders' performance of their funding obligations contain a "material adverse effect" or "MAC Out" provision); (AHM-Calyon 535921) (stating "Material Adverse Effect" means any "material adverse effect on … (ii) the business, operations, total Property or financial condition of such Person, (iii) the Mortgaged Assets …"); (§ 2.1) (AHM-Calyon 535932) (providing that Issuers may and Banks shall purchase mortgage loans).

[25]   See Email (Amy Williams, Hunton & Williams) dated November 19, 2006, a copy of which is attached hereto as Exhibit B (emphasis added).

[26]   Compare Hunton & Williams Draft Opinion Letter at 5 ([1] "*While the Repurchase Agreement does not follow a standard form repurchase agreement*, the Repurchase Agreement clearly falls

In addition to not following the Model BMA Form (or American Home's counsel's suggestion), Calyon departed from its own policies and procedures in preparing the Calyon Agreement. Those procedures dictated that capital market transactions of this type should be documented using what appears to be the Model BMA Form.[27]

Ultimately, Calyon decided to make hasty last-minute adjustments to the Calyon Loan to create the Calyon Agreement.[28] The differences relate solely to terminology, not substance. Indeed, the operative provisions remained unchanged except for linguistic amendments mirroring the text of section 101(47) of the Bankruptcy Code. For example, the following provisions are nearly identical: (1) the operative provisions relating to "advances" (Calyon Loan) and "purchases" (Calyon Agreement) and the methods for obtaining "advances" and "purchases;"[29] the operative provisions relating to "interest" (Calyon Loan) and "price

---

within the plain language of the 'repurchase agreement' definition under the Bankruptcy Code") (emphasis added); at 6 ([2] "Additionally, *while it can be argued that the Repurchase Agreement is not a standard repurchase agreement in the market*, the Repurchase Agreement does contain key features of standardized repurchase agreements") (emphasis added); at 6 ([3] "Thus, *while the Repurchase Agreement does not follow a standardized repurchase agreement form*, the Repurchase Agreement does contain many of the key features found in standardized repurchase agreements") (emphasis added); with Hunton & Williams Opinion Letter (Final) at 5-6 (containing citations [1] and [2], but deleting [3]). Copies of both letter are attached hereto as (Exhibit C1 and Exhibit C2, respectively).

[27] See "Calyon Americas General Credit Policies & Procedures Manual" at 113 (AHM-Calyon 3731) ("Documentation [for capital markets transactions] *should generally include a master agreement that sets for the parties' rights and obligations …. These include, within certain overlaps … The PSA Master Repurchase Agreement for repurchase or buy and sell transactions* …") (emphasis added).

[28] See Blackline Comparing "Amended And Restated Loan Agreement" with "Amended And Restated Repurchase Agreement," AHM-Calyon 53757-53891 (a copy of which is attached hereto as Exhibit D) (("Recitals") ("In light of recent changes to the Bankruptcy Code ... the parties hereto have agreed to substitute this Repurchase Agreement for the Existing Loan Agreement and to eliminate the Existing Repurchase Agreement, as provided herein").

[29] See Exhibit D (AHM-Calyon 53802-53806): Compare Calyon Agreement § 2.1 ("Maximum Facility Amount") ("[s]ubject to the terms of this Agreement ... an Issuer may ... make a *Purchase* ... so long as each *Purchase* is the least of (x) the Availability, (y) the Available Recognized Value, and (z) $25,000,000 ...") (emphasis added) with Calyon Loan § 2.1 ("Maximum Facility Amount") ("[s]ubject to the terms of this Agreement, from the Initial Funding Date ... an Issuer may ... made an *Advance* ... so long as each *Borrowing* is the least of

differential" (Calyon Agreement);[30] the provisions relating to "default interest" (Calyon Loan) and "default price differential" (Calyon Agreement);[31] and the affirmative and negative covenants.

## 2.    CSFB Agreement: Incorporates Terms From BofA Facility

The CSFB Agreement neither authorizes CSFB to return substituted or equivalent mortgage loans nor expressly allows CSFB to *sell* the mortgage loans in the absence of an Event of Default. Instead, CSFB must resell the identical mortgage loans it purportedly purchased.[32]

---

(x) the Availability, (y) the Available Collateral Value, and (z) $25,000,000 ...") (emphasis added). <u>Compare</u> Calyon Agreement § 2.3(a)(i) ("Notice and Manner of Obtaining *Purchases*") ("[t]he Sellers shall give the Administrative Agent and the Custodian notice of each request for a *Purchase*, pursuant to the *Purchase* Report ...") (emphasis added), <u>with</u> Loan Agreement § 2.3(a)(i) (("Notice and Manner of Obtaining *Borrowings*") ("[t]he Borrower shall give the Administrative Agent and the Collateral Agent notice of each request for a *Borrowing*, pursuant to a *Borrowing* Report ...") (emphasis added). <u>Compare</u> Calyon Agreement § 2.3(b) ("Type of *Purchase*") ("[e]ach *Purchase* by an Issuer shall initially be funded by the issuance of commercial paper by such Issuer .... [and] Each *Purchase* by a Bank shall be either a Base Rate Purchase or a Eurodollar Purchase ...") (emphasis added), <u>with</u>, Calyon Loan § 2.3(b) ("Type of *Loan*") ("[e]ach *Advance* by an Issuer shall be funded by the issuance of commercial paper by such Issuer .... [and] Each *Advance* by a Bank shall be either a Base Rate Advance or a Eurodollar Advance ..."  ) (emphasis added).

[30]  <u>See</u> <u>Exhibit</u> D (AHM-Calyon 53815-16): <u>Compare</u> Calyon Agreement § 2.10 ("*Price Differential* Rates") ("*Purchases* in respect of any CP Allocation shall accrue Price Differential with respect to each Price Differential Calculation Period comprimising such CP Allocation at a rate per annum equal to the Commercial Paper Rate applicable to such Price Differential Calculation Period, and the Purchases in respect of any ABR Allocation shall accrue Price Differential at either the Eurodollar Rate plus the Bank Margin, or the Alternate Base Rate ...") (emphasis added) <u>with</u>, Calyon Loan § 2.10 ("*Interest* Rates") ("*Borrowings* in respect of any CP Allocation shall bear interest with respect to each Interest Period comprising such CP Allocation at a rate per annum equal to the Commercial Paper Rate applicable to such Interest Period, and *Borrowings* in respect of any ABR Allocation shall bear interest at either the Eurodollar Rate plus the Bank Margin, or the Alternate Base Rate") (emphasis added). <u>See also</u> Adelson Tr. 200:9-13 ("[Q] And did you say that the way that interest or price differential was calculated did not change when the agreement -- [A] It's the same, you know, alternate base rate, CP rate, Eurodollar something rate ....").

[31]  <u>See</u> <u>Exhibit</u> D (AHM-Calyon 53815): <u>Compare</u> Calyon Agreement § 2.12 ("Default Rate") ("[s]o long as any Event of Default exists, all Repurchase Obligations shall accrue Price Differential at the Default Rate until paid"), <u>with</u>, Calyon Loan § 2.12 ("Default Rate") ("[s]o long as any Event of Default exists, all Obligations shall bear interest at the Default Rate until paid").

[32]  <u>See</u> CS 12089, 12104, 12110-11 (CSFB Agreement § 1 ("From time to time the parties hereto may enter into transactions in which Sellers agree to transfer to Buyer Mortgage Loans ... against

Other restrictions on alienability include the inability to replace the servicer (American Home) absent an Event of Default under the CSFB Agreement (or a "material default" under the servicing agreement).[33]

The agreement is at best ambiguous on the issue of entitlement to income from the mortgage loans. In certain circumstances, American Home need only remit that portion of the interest income required to pay the price differential.[34] Moreover, the agreement does not restrict

---

the transfer of funds by Buyer, *with a simultaneous agreement by Buyer to transfer to Sellers such Mortgage Loans ... at a date certain or on demand, against the transfer of funds by Sellers"*) (emphasis added); § 4(a) ("The sellers shall repurchase the related Purchased Assets from Buyer on each related Repurchase Date ... The Sellers are obligated to repurchase and take physical possession of the Purchased Assets from the Buyer ... on the related Repurchase Date") ("Purchased Asset means a Mortgage Loan ... as evidenced by a Transaction Request and a Trust Receipt;" "Transaction Request means a request by a Seller to Buyer ... to enter into a Transaction"). Compare CS 12145 (§ 18 ("Buyer may, in its sole discretion, engage in repurchase transactions with the Purchased Assets or otherwise pledge, hypothecate, assign, transfer or otherwise convey the Purchased Assets with a counterparty of the Buyer's choice") with, CS 12140 (§ 16(d) (upon Event of Default, "Buyer shall have the right *to immediately sell the Purchased Assets with or without cause.* In addition, Buyer shall have the right to sell the Purchased Assets and liquidate all the Repurchased Assets. Such disposition of Purchased Assets may be, at the Buyer's option, on either a servicing-released or servicing-retained basis ...") (emphasis added). See also Tr., Deposition of Bruce S. Kaiserman ("Kaiserman Tr.") at 32:2-9 ("[Q] *And is Credit Suisse required to return the same mortgage loans that it purchased from AHM to AHM .... [A] That's my understanding"*) (emphasis added); at 53:12-20 ("[Q] Okay. So stated another way, if I'm getting the gist of your answer, Credit Suisse doesn't have the right to return substituted assets .... [A] I think that's fair, yeah"); Deposition of Gary Timmerman ("Timmerman Tr.") at 71:19-72:7 ("[Q] ... With respect to the Credit Suisse master repurchase agreement ... do you have an understanding as to whether or not at the conclusion of that agreement Credit Suisse has to return the identical mortgage loans which they purchased from American Home. [A] Yes. [Q] What is that understanding? [A] *It is to return the collateral that was pledged or purchased, excuse me, under the repo facility"*) (emphasis added).

[33]   See CS 12123 (CSFB Agreement § 12(e) ("*Upon the occurrence of an Event of Default herender or a material default under the Servicing Agreement,* Buyer shall have the right to immediately terminate the Servicer's right to service the Purchased Assets under the Servicing Agreement without payment of any penalty or termination fee") (emphasis added). See, e.g., Tr., Hearing, August 16, 2007, at 40:10-13 ([Bruce Kaiserman:] "For us to sell them, we must be able to present to the purchaser the servicing rights associated with the loans. *We simply cannot sell them if we don't have control of the servicing rights*) (emphasis added).

[34]   Compare CS 12113-14; CS 12140 (CSFB Agreement § 7(a) (Seller deposits income into collection account); § 7(b) (absent an event of default, Seller remits proceeds to the buyer only in amounts sufficient to pay interest increment of purchase price: *"Sellers shall remit to Buyer an amount equal to the Price Differential out of the interest portion of the Income paid in respect of the Purchased Assets .... Upon termination of any Transaction, to the extent that there is*

the sources to which American Home can look to make that payment. Instead, American Home can pay the price differential from other revenue streams apart from the mortgage loans' income. American Home will introduce testimony to explain how, in practice, the parties performed under the CSFB Agreement.

The CSFB Agreement contains a wide array of features found in secured loans, including (1) a price differential that bears no relationship to the interest paid on the underlying mortgage loans and instead depends on American Home's creditworthiness and the quality of he underlying mortgage loans, i.e., the extent to which they were delinquent or "aged;"[35] (2) financial covenants and "commitment fees;"[36] and (3) conditions precedent to funding.[37]

---

*any excess Income after repayment of all amounts to be transferred to Buyer by Sellers, Buyer, in its sole option, may apply the excess income to reduce the Repurchase Price due upon termination of any outstanding Transactions"*) (emphasis added); § 7(c) (*upon event of default,* "Seller shall remit to Buyer all Income received with respect to each Purchased Asset ..."); § 16(d) (*upon event of default,* seller cannot "commingle the amounts received"); with § 7(a) ("If income is paid in respect of any Purchased Asset during the term of a Transaction, such Income shall be the property of the Buyer")).

[35]  See CS 12012-03 (§ 2) ("Price Differential" calculated by multiplying "Pricing Rate" by the "Purchase Price" for a transaction, "calculated daily on the basis of a 360-day year for the actual number of days during the period commencing on (and including) the Purchase Date ... and ending on (but excluding) the Repurchase Date"); CS 12225-12233 (Pricing Side Letter § 1.9 (defining "Pricing Rate" as LIBOR plus a percentage that varies by category (and quality) of loan involved in the transaction, e.g., conforming loans, "aged" loans). See also Timmerman Tr. at 42:18-43:8 ("*[Q] Do you have an understanding as to whether there is a relationship between the price differential and the interest that is paid on the underlying mortgage loan?* [A] Not to my knowledge. [Q] Not to your knowledge you don't have an understanding, or not to your knowledge that they are related? [A] *That they are related. Because there are different rates, you are going to have different coupons, and on a non-performing loan you can have a coupon of which -- if there is a non-performing mortgage you are still going to pay Credit Suisse for entering into this transaction*") (emphasis added).

[36]  See CS 12130-39 (containing covenants to, inter alia, (i) maintain a pre-set "Adjusted Net Worth;" (ii) maintain "Indebtedness to Net Worth" ratios; (iii) demand notice of material litigation; (iv) prohibit material changes to corporate structure (v) require minimum insurance levels; (vi) require American Home to defend Credit Suisse's interests in the Purportedly Purchased Assets; (vii) direct American Home to keep books and records of account in reasonable detail; (viii) to prohibit American Home from making any "material change in the nature of [their] business;" and (ix) limit transactions with affiliates). See Timmerman Tr. 43:23-44:4 ("[Q] What is the commitment fee designed to encompass? [A] *The commitment fee is paid by a client for the purpose of having the repo financing available to them absent an event of default*") (emphasis added).

When drafted, the CSFB Agreement incorporated various features from the BofA Facility. Among other things, CSFB looked to the BofA Facility in setting up the "borrowing and guaranteeing" entities (CSFB's terms).[38] It also honored American Home's request that the covenants, if any, mirror those to which American Home previously had agreed with respect to the BofA Facility.[39] CSFB used it own internal form as a starting point instead of market forms.[40]

---

[37] See CS 12118-21 (§ 10(b)(8)) (listing "Conditions Precedent" to CSFB's performance of its funding obligations to contain a "material adverse change" or "MAC Out" should "an event or events ... [occur] in the good faith determination of Buyer resulting in the effective absence of a 'repo market' or comparable 'lending market' for financing debt obligations secured by mortgage loans or securities or an event or events shall have occurred resulting in Buyer not being able to finance Purchased Assets through the 'repo market' or 'lending market' with traditional counterparties at rates which would have been reasonable prior to the occurrence of such event or events ...").

[38] See CS11665-11675 (Email From Randall Shy (CSFB) to American Home enclosing "term sheet" for CSFB Agreement, stating "[w]hen reviewing the attached please know that (i) *in setting up the borrowing & guaranteeing entities, we looked to the structure outlined in the BofA materials that we have been provided with*, and (ii) we've left the material covenants 'TBD.' We're very much open to discussing both with you when we speak Monday") (emphasis added).

[39] See Timmerman Tr. 49:7-50:10 ("[Q] Do you have an understanding of what Mr. Shy means when he refers to quote: The BofA materials? [A] That must be the facility in which Credit Suisse is the secured loan in which we are a participant. [Q] Do you have an understanding of why he received those materials .... [A] *My understanding from a conversation with American Home was they wanted to try and manage to a similar set of covenants across as many facilities as possible .... [Q] A similar set of financial covenants in the B of A credit facility; is that correct? [A] Correct*") (emphasis added).

[40] See Kaiserman Tr. at 11:24-12:15 ("[Q] Did you have a role in negotiating the agreement that's at issue in the litigation? [A] Sure. *The agreements are on Credit Suisse's forms so as a starting matter, it's our form.* Comments that were submitted were reviewed by our counsel. Standing instructions with our counsel is to raise issues to my attention. None were raised and the agreement was signed. [Q] What is the Credit Suisse form? [A] I don't understand the question. [Q] What is the Credit Suisse form that you referenced in your previous answer? [A] A form of Master Repurchase Agreement"); at 80:12-25 ("[Q] The Bond Market Association has a form Master Repurchase Agreement that companies modify and use for their transactions? [A] Yes. [Q] Does Credit Suisse use that form today? [A] Yes. *[Q] Is the agreement that Credit Suisse and AHM signed based on the Bond Market Association form ... [A] Again, the agreement between AHM and Credit Suisse was based on our Credit Suisse form that I mentioned earlier*") (emphasis added).

DB02:6345651.1
064657.1001

## B. Operational & Course Of Dealing Evidence Demonstrates Transactions Substantively Are Secured Loans

### 1. Calyon Agreement: Transactions Under Repurchase Agreement And Loan Agreement Are The Same Mechanically And Operationally

Calyon's expert testified extensively that *operationally, nothing changed* between the Calyon Loan and the Calyon Agreement, including with respect to funding and payment dates.[41] The language relating to Calyon's inability to sell the underlying mortgage loans also appears unchanged, which is not surprising considering Calyon's proposed expert testified that whether the mortgage loans were "sold" is irrelevant to the analysis of whether it is a *repurchase* agreement within the safe harbor provisions.[42] Lastly, the Calyon Agreement appears to have been viewed within the firm as a "loan" -- it was referred to as a loan, and the underlying mortgage loans were referred to as "collateral."[43]

---

[41]   See Adelson Tr. 199:7-200: 5 ([A] [to question concerning changes between Calyon Loan and Calyon Agreement] *"The purpose of making the new agreement is to fit it under the safe harbor of the Bankruptcy Code, not to change the details or mechanics of the relationship between a mortgage company and a warehouse facility provider. [Q] So the underlying mechanics stay the same, the agreement still operates the same way with the changes in the terminology? [A] Yeah, yeah. Changes, if any, were very small. I can't think of anything in day-to-day operation that you would actually have to do differently because you don't want to change what you do day-to-day. [Q] So as far as you know, the way payments were made didn't change although the titles would have changed; payment dates, things of that nature? [A] Right, right.* You would still get your funding when you originate loans and pay it back when you close out the repo or pull the loans out of the facility to sell them off in their securitization") (emphasis added). American Home continues to object to the admission of Adelson's testimony and report on the grounds of spoliation of evidence, as set forth fully in its Motion In Limine.

[42]   See Adelson Tr. 153:12-18 ("[Q] Under the Calyon repurchase agreement, is it your position that that the analysis of whether or not the mortgage loans are sold or not is governed by the factors of 559 or by an analysis of economic risk? [A] It's neither. 559 doesn't ask about whether or not there has been a true sale"); 195:14-21 ("[Q] ... If it turns out under the Calyon agreement that the mortgage loans are not sold in a true sale, but instead they are merely pledged as collateral, does that change your conclusion as to whether or not the Calyon agreement is a repurchase agreement for the purposes of 559. [A] It does not ...").

[43]   See AHM-Calyon 50444 (a copy of which is attached hereto as Exhibit E) (Email Dated July 28, 2007 from Sam Pilcer (Calyon) to warehouse lending syndicate under Calyon Agreement: "AM Home and Lazard have made no real progress. They indicated several possibilities they are

## 2.  CSFB Agreement: Consistent With Overall Objective Of Re-Hypothecating Mortgage Loans To CSFB Affiliates, Sales Of Mortgage Loans To Third Parties Were Not Attempted

CSFB did not, prior to any Event of Default, attempt to sell the mortgage loans to any third parties. Instead, they merely "re-hypothecated" them to its affiliates -- which appears to have been CSFB's objective from the inception of the transaction. Rather than engage in a repurchase transaction for the purpose of promptly selling the underlying assets to third parties -- subject only to their obligation to return equivalent assets (as would be the case for a true repurchase agreement) -- CSFB merely pledged the mortgage loans to one of its branches -- Credit Suisse First Boston, Nassau Branch[44] -- under a separate agreement.[45]

---

working on that they couldn't be too specific on. *We told them we are calling our loan .... They didn't contest our ability to call our loan. They were hoping to hold off our realization efforts for a day*") (emphasis added); (Email Dated July 28, 2007 from Same Pilcer (Calyon) to warehouse lending syndicate: "We will be speaking to Craig Pino at 5 pm .... we also need to convey to him the direction that the conduit *lending group* wants to take on this loan. *That message is that we will no longer provide any funding to this transaction and we would expect to be paid off from the proceeds of realization of our collateral ...*") (emphasis added). See also Pilcer Tr. 137:9-12 ("*[Q] Did you view the term 'loan' and 'repo' as being interchangeable at least in this context that you were sending this e-mail? [A] I assume so*") (emphasis added); Sidrane Tr. 65:7-11 ("[Q] What do you understand [Pilcer] to be referring to when he uses the phrase 'our loan' in this email? [A] Well, I would make the assumption that he is referring to a repurchase agreement").

[44]  It is not clear whether these "branches" are, in fact, separate corporate entities from CSFB (the signatory to the CSFB Agreement). If not, it demonstrates that CSFB never transferred the underlying mortgage loans to any other entity, affiliated or otherwise, and instead simply "parked" the loans.

[45]  See Kaiserman Tr. 32:17-20 ("[Q] Were any of the mortgage loans that Credit Suisse purchased from AHM resold to any non-affiliates of Credit Suisse? [A] Not to my knowledge"); at 72:5-9 ("[Q] Did Credit Suisse try to sell mortgage loans to a non-affiliate? [A] American Home loans? [Q] American Home loans, yes. [A] No"); 94:10-14 ("[Q] Do you have an understanding as to whether they resell loans to other affiliates or to third-party entities? [A] I believe they sell to other affiliates"); 95:9-14 ("[A] *For each transaction we entered into with American Home under our Master Repurchase Agreement with them, we knew that we would enter into Master Repurchase Agreements with the Nassau Branch or the Cayman branch and therefore did not consider third parties*") (emphasis added). See also Timmerman Tr. 72:8-12 ("[Q] Do you have an understanding as to whether or not during the term of the transaction Credit Suisse can sell those mortgage loans. [A] They can re-hypothecate them"); 73:15-18 ("[Q] *To your knowledge, would they absent and event of default sell the mortgage loans to a third party? [Q] No.*") (emphasis added); at 74:10-25 ("[Q] Do you have an understanding as to whether or not Credit Suisse entered into any transactions with its affiliates with respect to the mortgage loans at issue in this agreement .... [A] Yes, *I am aware that Credit Suisse provided underwriting services for*

Lastly, CSFB's internal manual relating to the appropriate due diligence for warehouse lending reads as though the repurchase agreement counterparty is a borrower under a secured loan. CSFB outlines a due diligence inspection to determine if loaning funds to the potential borrower is consistent with its "lending philosophy." That review entails an examination of the financial risk the borrower presents.[46] A repurchase agreement, however, presumably focuses on the value of the underlying assets -- not the borrower's assets or creditworthiness.

---

*a securitization which was the main impetus for the line for some of the loans that we financed"*) (emphasis added).

[46] See CS 13565 ("RMBS -- Conduit Process Control Manual") ("Chapter 17: Warehouse Lending") (§ 17.1 "Customer Approval Process:" "To the extent the Credit Suisse Mortgage Finance Group cares to initiate a financing relationship with the prospective Customer, a conference call may be arranged with them in order to gain a current understanding of their business model, credit needs, and suitability"); CS 13567 (§ 17.2 "Diligence & Credit Review:" "The overall objective in the Credit Suisse Mortgage Finance Group's due diligence *is to evaluate the level of risk associated in doing business with a prospective Customer and their ability to operate in accordance with Credit Suisse Mortgage Finance Group's lending philosophy .... In its review of a prospective Customer, the Credit Suisse Mortgage Finance Group will give consideration to such items as leverage, liquidity, personal guarantees, earnings, capital levels and structures, operational soundness and reputation in the marketplace"*) (emphasis added).

Respectfully submitted,

Dated: Wilmington, Delaware
November 5, 2007

YOUNG, CONAWAY, STARGATT &
TAYLOR, LLP

James L. Patton, Jr. (No. 2202)
Robert S. Brady (No. 2847)
John T. Dorsey (No. 2988)
Erin D. Edwards (No. 4392)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

-and-

QUINN, EMANUEL, URQUHART, OLIVER
& HEDGES LLP
Susheel Kirpalani
James C. Tecce
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7199
Facsimile: (212) 849-7100

*Counsel to American Home Mortgage Corp.;
American Home Mortgage Acceptance, Inc.;
American Home Mortgage Servicing, Inc.;
American Home Mortgage Investment Corp.;
and American Home Mortgage Holdings, Inc.*

24