# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| AMERICAN HOME MORTGAGE, | ) Case No. 07-11047 (CSS) |
| INC., et al., | ) (Jointly Administered) |
| | ) |
|     Debtors. | ) |
|   | ) |
| CALYON NEW YORK BRANCH, | ) |
| | ) |
|     Plaintiff and | ) |
|     Counterclaim Defendant, | ) |
| | ) |
| v. | ) Adv. Proc. No. 07-51704 (CSS) |
| | ) |
| AMERICAN HOME MORTGAGE CORP., | ) |
| AMERICAN HOME MORTGAGE | ) |
| SERVICING, INC., AMERICAN | ) |
| HOME MORTGAGE ACCEPTANCE, INC., | ) |
| and AMERICAN HOME MORTGAGE | ) |
| INVESTMENT CORP., | ) |
| | ) |
|     Defendants and | ) |
|     Counterclaim Plaintiffs. | ) |

## OPINION

HUNTON & WILLIAMS LLP
Benjamin C. Ackerly
Jason W. Harbour
Riverfront Plaza, East Tower
951 E. Byrd Street
Richmond, VA  23219

ECKERT SEAMANS CHERIN
& MELLOTT, LLC
Michael G. Busenkell
Margaret F. England
300 Delaware Avenue,  Suite 1210
Wilmington, DE  19801

Peter S. Partee
Scott H. Berstein
200 Park Avenue, 53rd Floor
New York, New York  100166-0136

**Counsel to Calyon**
**New York Branch**

YOUNG, CONAWAY, STARGATT & TAYLOR, LLP
James L.  Patton, Jr.
Robert S. Brady
John T. Dorsey
Erin Edwards
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE  19801

QUINN, EMANUEL, URQUHART OLIVER & HEDGES, LLP
Susheel Kirpalani
 James C.  Tecce
51 Madison Avenue, 22nd Floor
New York, New York 10010

**Counsel to American Home Mortgage Corp.; American Home Mortgage Acceptance, Inc.; American Home Mortgage Servicing, Inc.; and American Home Mortgage Investment Corp.**

Dated: January 4, 2008

Sontchi, J.

<u>**INTRODUCTION**</u>

This is a case of first impression regarding the application of the amended "safe harbor" provisions of sections 555 and 559 of the Bankruptcy Code to a repurchase agreement involving mortgage loans.

The dispute centers on three issues.  The first issue is whether the sale and repurchase of mortgage loans under the contract in question is a "repurchase agreement" as defined in section 101(47) of the Bankruptcy Code and thus, pursuant to sections 362(b)(7), 555 and 559 of the Bankruptcy Code, the rights of the non-debtor party to the contract related to the sale and repurchase of mortgage loans are not stayed, avoided or otherwise limited by the operation of any provision of the Bankruptcy Code.  The Court finds that, under the plain meaning of section 101(47) of the Bankruptcy Code, the contract for the sale and repurchase of mortgage loans in this case is a "repurchase agreement" under the statute and the "safe harbor" provisions of sections 555 and 559 of the Bankruptcy Code are applicable.

The second issue is whether the entirety of the contract is a "repurchase agreement."  Specifically, is the portion of the contract providing for the

servicing of mortgage loans (as opposed to the sale and repurchase of mortgage loans) also protected under the safe harbor provisions?  The Court finds that the servicing of mortgage loans is *not* protected under the safe harbor provisions because: (i) under applicable law, the portion of the contract providing for the servicing of the mortgage loans is severable from the portion of the contract providing for the sale and repurchase of mortgage loans; and (ii) the portion of the contract providing for servicing mortgage loans is neither a "repurchase agreement" nor a "securities contract" under the Bankruptcy Code.

The third and final issue is whether the Court should require the Debtors to transfer the rights and obligations relating to servicing the mortgage loans to the plaintiff.  As the Court finds that the portion of the contract providing for the servicing of the mortgage loans is not subject to the safe harbor provisions, there is simply no basis to require the Debtors to transfer property of the estate (i.e., the right to service of the mortgage loans under the contract) to the plaintiff.

## JURISDICTION

This Court has subject matter jurisdiction under 28 U.S.C. § 1334(b).  Venue is proper in this district under 28 U.S.C. §§ 1408 and 1409(a).  This is a core proceeding under 28 U.S.C. §157(b)(2)(A), (B), (C), (E), (G), (K) and (O).

## PROCEDURAL BACKGROUND

On August 6, 2007, American Home Mortgage Corp. and certain of its affiliates filed bankruptcy under Chapter 11.  Shortly thereafter, Calyon New York Branch, as Administrative Agent, ("Calyon" or "Plaintiff") filed a complaint against American Home Mortgage Corp., American Home Mortgage Acceptance, Inc. ("AHM Acceptance"), American Home Mortgage Servicing, Inc. ("AHM Servicing"), and American Home Mortgage Investment Corp. ("AHM Investment") (collectively, the "Debtors" or "Defendants").[1]  In the complaint,

---

[1] Not all of the Chapter 11 debtors are defendants in this adversary proceeding.  Unless otherwise indicated, the term "Debtors" in this Opinion refers only to those Chapter 11 debtors that are parties to this adversary proceeding.

Calyon seeks: (i) a declaratory judgment that the Contract (as defined below) between Calyon and the Debtors is a "repurchase agreement" as defined in section 101(47) of the Bankruptcy Code and thus, pursuant to sections 362(b)(7), 555 and 559 of the Bankruptcy Code, the rights of Calyon under the Contract are not stayed, avoided or otherwise limited by the operation of any provision of the Bankruptcy Code; and (ii) injunctive relief compelling the Debtors to transfer the rights and obligations relating to servicing the mortgage loans that are the subject of the Contract to Calyon.

In response to the complaint, the Debtors filed an answer and a counterclaim. The Debtors deny that the Contract is a "repurchase agreement" as defined in section 101(47) of the Bankruptcy Code, arguing that the Contract is, in fact, a secured financing. In the alternative, the Debtors argue that the portion of the Contract providing for the servicing of the mortgage loans (as opposed to the sale and repurchase of mortgage loans) is not protected under the safe harbor provisions.[2]

The parties agreed to bifurcate the issues for trial. In early November, 2007, the Court conducted the "Phase I" trial limited to the issues discussed above, i.e., whether (i) the Contract, in whole or in part, is a "repurchase agreement;" and (ii) Calyon is entitled to injunctive relief compelling the Debtors to transfer the rights and obligations relating to servicing the mortgage loans to Calyon. The parties submitted post-trial briefs and the Court heard oral argument in late November, 2007. This is the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052 in connection with the Phase I trial.

---

[2] In the counterclaim, the Debtors seek a declaratory judgment that the Contract is a secured financing and not a "repurchase agreement" under the Bankruptcy Code.

## STATEMENT OF FACTS

### I.   General Background

The Debtors and Calyon[3] are parties to that certain Repurchase Agreement dated as of November 21, 2006 (the "Contract").  The Contract establishes the relationship between the Debtors and Calyon and outlines the rights and obligations related to the sale and repurchase of mortgage loans thereunder.  More specifically, the Contract provides for the transfer of one or more mortgage loans or interests in mortgage loans from the Debtors to security issuers and banks (hereinafter together, "Purchasers") in exchange for the transfer of funds from Purchasers to the Debtors.  The Contract further provides that the Purchasers will return the mortgage loans or interests in mortgage loans to the Debtors not later than 180 days after the initial transfer in exchange for the transfer of funds from the Debtors to the Purchasers.

At the time the Contract was executed, the Debtors' business primarily entailed the origination, servicing, and sale of mortgage loans, as well as investment in mortgage loans and mortgage-backed securities resulting from the securitizations of residential mortgage loans.  The purpose of the Contract was to provide the Debtors with funds for the origination of mortgages loans.  The funds to originate the mortgage loans were transferred by the Purchasers to the Debtors.  Immediately upon origination, the mortgage loans were transferred to the Purchasers on an interim basis while the Debtors attempted to arrange for their final disposition, either by sale to a private investor on a whole loan basis or to a securitization trust.  Upon final disposition of the mortgage loans, the loans were repurchased by the Debtors in exchange for a payment to the Purchasers - consisting of the original purchase price paid to the Debtors plus the "Price

---

[3] Calyon is a party to the Contact in its capacity as "a bank, a Managing Agent and the Administrative Agent."  Although there are additional, non-debtor parties to the Contract, they are not parties to this adversary proceeding and their identity is not material to the issues before the Court.

Differential."  The Price Differential is the applicable *per diem* "Pricing Rate" multiplied by the number of days the mortgage loans were in the hands of the Purchaser.  Upon repurchase by the Debtors, the mortgage loans were immediately transferred by the Debtors to the ultimate purchaser, i.e., either the private investor or securitization trust.

Prior to the Debtors' bankruptcy, mortgage loans sold to the Purchasers under the Contract generally remained in the possession of the Purchasers for approximately 30 days before they were repurchased by the Debtors.  As of the Petition Date, the outstanding repurchase price for mortgage loans in the Purchasers' possession under the Contract was approximately $1.2 billion (exclusive of the Price Differential, interest and costs).

The Contract also provides for the servicing of the mortgage loans subject to the Contract.  Whether a home mortgage loan is owned by the loan originator, a party to a repurchase agreement, a securitization trust or a private investor, the loan requires servicing.  Servicing a mortgage loan encompasses collecting mortgage payments, administering tax and insurance escrows, responding to borrower inquiries, and maintaining control over the collection and default mitigation processes.  The "servicer" of a mortgage loan is usually paid a fee for servicing the loan based upon the unpaid principal balance (or "UPB") of the mortgage loan being serviced.  The servicer of the mortgage loans subject to the Contract in this case is entitled to a monthly servicing fee of 50 basis points applied to the UPB of the mortgage loans being serviced.

Mortgage loans can be bought and sold on either a "servicing retained" or a "servicing released" basis.  In a servicing retained sale of a mortgage loan, the seller of the loan retains the right to designate the mortgage loan servicer.  Concomitantly, in a servicing released sale of a mortgage loan, the buyer purchases the mortgage loan and right to designate the mortgage loan servicer.  All things being equal, a buyer will pay a higher price in a servicing released transaction because the buyer is purchasing the underlying mortgage loan and

the right to receive the payments for servicing the loan (which presumably generate a profit for the servicer). In this case, the mortgage loans were sold to the Purchasers on a servicing retained basis, i.e., the Debtors retained the right to designate the servicer under the loans. AHM Servicing is the designated servicer under the mortgage loans under the Contract and, thus, is entitled to the monthly servicing fee.[4]

## II.    The Defaults Under the Contract and the Debtors' Bankruptcy

In the weeks prior to the Petition Date, a major disruption in the global credit markets caused a significant write-down of the Debtors' loan and security portfolios and consequently resulted in margin calls for hundreds of millions of dollars with respect to the Debtors' loans. During this time, certain of the Debtors' lenders began to exercise remedies against the Debtors, thereby restricting the Debtors' ability to originate loans and threatening the Debtors' continued viability.

The Debtors' inability to originate loans and the exercise of remedies by certain lenders against the Debtors created a severe liquidity crisis and forced the Debtors to discontinue their retail and indirect loan origination business. As a result, on August 3, 2007, the Debtors implemented a massive reduction in workforce, resulting in the firing of over 6,500 employees.

As a result of the disruption in the credit markets and the deterioration of the Debtors' business, on August 1, 2007, Calyon sent the Debtors a letter captioned as a "Notice of Event of Default," in which Calyon asserted that the Debtors were in default under the Contract and demanded that the Debtors immediately repurchase all of the mortgage loans in the Purchasers' possession

---

[4] As the Contract expired under its own terms on November 20, 2007, Calyon argues that AHM Servicing is no longer entitled to receive the servicing fee, notwithstanding that AHM Servicing continues to service the mortgage loans. The Debtors dispute Calyon's position. The Court makes no decision here concerning the dispute over whether AHM Servicing is entitled to any payment for servicing the mortgage loans under the Contract after November 20, 2007.

under the Contract.  The Debtors did not respond to this letter or fulfill any of Calyon's demands.

On the same date, Calyon sent the Debtors a separate letter captioned as a "Notice of Event of Default to Servicer," in which Calyon asserted that the Debtors were in default under the Contract, demanded that the Debtors immediately repurchase all of the mortgage loans in the Purchasers' possession under the Contract, designated JPMorgan Chase Bank, N.A. ("Chase") as the new servicer with respect to most of the mortgage loans under the Contract, and demanded that the Debtors take all actions necessary to transfer the servicing of the mortgage loans under the Contract to Chase.  The notice further designates AHM Servicing as the "interim servicer" of the mortgage loans under the Contract, pending the transfer of servicing to Chase.

Shortly thereafter, on August 6th, the Debtors filed bankruptcy.  The filing of bankruptcy constituted an event of default under the Contract.

On August 28, 2007, Calyon terminated the services of AHM Servicing as interim servicer and demanded that the Debtors take all actions necessary to transfer the servicing of the mortgage loans under the Contract to the newly designated servicers.[5]  On the same date, Calyon commenced this adversary proceeding by filing a complaint.

The Debtors dispute Calyon's right to exercise its default remedies under the Contract and have refused to repurchase the mortgage loans or transfer servicing of the loans.

---

[5] In addition to Chase, Calyon designated Canlar FSB as the servicer for certain of the mortgage loans under the Contract.

## LEGAL DISCUSSION

I.    **The Contract For The Sale And Repurchase Of Mortgage Loans In This Case Is A "Repurchase Agreement" Under The Statute And The "Safe Harbor" Provisions Of Sections 555 And 559 Of The Bankruptcy Code Are Applicable.**

A.    **Background**

In *Bevill, Bresler & Schulman Asset Mgmt. Corp. v. Spencer S&L Ass'n. (In re Bevill, Bresler & Schulman Asset Mgmt. Corp.)* , the Third Circuit succinctly described the nature of the agreement before the Court:

> A standard repurchase agreement, commonly called a "repo," consists of a two-part transaction. The first part is the transfer of specified securities by one party, the dealer, to another party, the purchaser, in exchange for cash. The second part consists of a contemporaneous agreement by the dealer to repurchase the securities at the original price, plus an agreed upon additional amount on a specified future date. A "reverse repo" is the identical transaction viewed from the perspective of the dealer who purchases securities with an agreement to resell. [6]

In this case, the Contract is a "repurchase agreement" (as opposed to a "reverse repurchase agreement"), the "specified securities" are mortgage loans, the Debtors are the "dealers," and the Purchasers (with Calyon serving as agent) are the "purchasers."

The repo market, which has expanded dramatically in the last 30 years, is utilized by the Federal Reserve to set and stabilize monetary policy and by sophisticated institutional investors as a safe method to meet short and long term liquidity needs.  The repo market is a critical component not only of the U.S. capital markets, but also of global capital markets.  For example, it has become the principal means of financing the market for United States government securities and has expanded to include other types of financial investments, such

---

[6] *Bevill, Bresler & Schulman Asset Mgmt. Corp. v. Spencer S&L Ass'n. (In re Bevill, Bresler & Schulman Asset Mgmt. Corp.)*, 878 F.2d 742, 743 (3d Cir. 1989).

as mortgage-backed securities and mortgage loans.[7]  The common element in all uses of repurchase agreements is liquidity.  "Without that characteristic, the repurchase agreement would not serve the function that it now does."[8]

If a party to a repurchase agreement commences a bankruptcy case, absent some special protection, the rights and remedies of a non-debtor party to a repurchase agreement would be subject to a number of provisions of the Bankruptcy Code that would impair the liquidity of the investment.  For example:

- The automatic stay imposed pursuant to section 362(a) would prevent the postpetition exercise of contractual rights to terminate the repurchase agreement, accelerate the obligations of the parties, sell or recover the underlying securities, and set off the remaining mutual debts and claims under the repurchase agreement;

- The repurchase agreement could be assumed or rejected by the debtor pursuant to section 365, possibly a significant period of time after performance by the debtor was required under the terms of the repurchase agreement (thus affording the debtor the benefit of knowing the market price of the securities subject to the repurchase agreement weeks or months after the originally scheduled repurchase date before making its determination whether to complete the transaction at the repurchase price specified in the agreement); and

- Prepetition payments or transfers of securities by the debtor might be recovered as preferences pursuant to sections 547 and 550.[9]

As a result, since 1982, Congress has enacted a number of amendments to the Bankruptcy Code that work in concert to preserve the liquidity of the repo

---

[7] Kenneth D. Gardade, *The Evolution of Repo Contracting Conventions in the 1980's*, FRBNY ECONOMIC POLICY REVIEW, May 2006, at 27-28.  *See also In re Bevill, Bresler & Schulman Asset Mgmt. Corp.*, 878 F.2d at 745-6; and 5 COLLIER ON BANKRUPTCY ¶¶ 559.04 and 559.LH (Alan N. Resnick and Henry J. Sommer eds. 15th ed. rev. 2007)

[8] *In re Bevill, Bresler & Schulman Asset Mgmt. Corp.*, 878 F.2d at 746 (quoting *Bankruptcy Law and Repurchase Agreements: Hearings on S. 445 Before the Subcomm. on Monopolies and Commercial Law of the Senate Comm. on the Judiciary*, 98th Cong., 1st Sess. 306 (1983) (Statement of Peter Sternlight, Executive Vice President, Federal Reserve Bank of New York)).

[9] 5 COLLIER ON BANKRUPTCY ¶ 559.01.

market by exempting repurchase agreements from significant provisions such as the automatic stay.  More specifically, Congress has enacted:

- Sections 555 and 559, which protect the exercise of certain contractual rights to liquidate, terminate and accelerate repurchase agreements from stays, avoidance and other limitations;

- Sections 362(b)(7) and 362(o), which exempt from the automatic stay and all other Bankruptcy Code stays setoffs under repurchase agreements and the realization against collateral for repurchase agreements;

- Sections 546(f) and 548(d), which provide exemptions from preference and fraudulent transfer avoidance for settlement and margin payments; and

- Portions of sections 101 and 741, which define the key terms repurchase agreement, margin payment, settlement payment, repo participant and financial participant.[10]

Section 559 and its exclusion of repurchase agreements from the automatic stay are of primary significance.  Collier explains that "[m]ost repurchase agreements afford a nondefaulting party the right to 'close-out' or 'liquidate' the agreement upon the other party's default.[11]  Furthermore, virtually all repurchase agreements contain *ipso facto* clauses which authorize repo participants to terminate "for cause" (or otherwise forfeit or modify rights) if the other party becomes bankrupt, insolvent, or fails to maintain contractually specified conditions.[12]  "In almost all instances, commencement of a Bankruptcy Code case by a party … will constitute a default triggering the availability of such rights."[13]  Such clauses permit termination of the repurchase agreement simply because of the other party's distressed financial condition.  Section 559 protects rights triggered by a condition of the kind specified in section 365(e)(1),

---

[10] *Id.*

[11] *Id.* at ¶ 559.04.

[12] *Id.* at ¶¶ 559.04 and 559.LH.

[13] *Id.*

i.e., *ipso facto* clauses or bankruptcy defaults.[14]    Thus, "section 559 allows protected parties to act upon *ipso facto* clauses."[15]

In addition, section 555 of the Bankruptcy Code provides the tool for the non-defaulting repo participant to exercise its contractual right to close-out, terminate or accelerate a "securities contract."[16] "Such a close-out or liquidation typically entails termination or cancellation of the contract, fixing of the damages suffered by the nondefaulting party based on market conditions at the time of the liquidation, and accelerating the required payment date of the net amount of the remaining obligations and damages."[17]

Finally, as part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Congress expanded the definition of "repurchase agreement" to include the transfer of "mortgage related securities (as defined in section 3 of the Securities Exchange Act of 1934), mortgage loans, [and] interests in mortgage related securities or mortgage loans."[18]

In this case, the Contract contains an *ipso facto* clause similar to that discussed above.  Thus, if the sale and repurchase of mortgage loans under the Contract is a "repurchase agreement" as defined in section 101(47) of the Bankruptcy Code, pursuant to sections 362(b)(7), 555 and 559 of the Bankruptcy Code, the rights of Calyon are not stayed, avoided or otherwise limited by the operation of any provision of the Bankruptcy Code and the *ipso facto* clause in the Contract is enforceable.

B.    <u>The Nature and Scope of the Court's Inquiry</u>

Calyon argues that in order for the Court to determine whether the sale and repurchase of mortgage loans under the Contract is a "repurchase

---

[14] *Id.*

[15] *Id.*

[16] As defined in 11 U.S.C. § 741.

[17] 5 COLLIER ON BANKRUPTCY ¶ 555.04.

[18] 11 U.S.C. § 101(47).

agreement" it need only apply the definition set forth in section 101(47) to the four corners of the Contract. Calyon argues that further analysis of the statute and the Contract is neither required nor appropriate.

The Debtors disagree. They argue that liquidity and alienability are the *sine qua non* of a repurchase agreement. Thus, the Court should not simply apply the definition set forth in section 101(47) but rather must go beyond the statute and examine the substance of the Contract to determine whether it is a "true" repurchase agreement or a disguised secured financing. Moreover, the Debtors argue that in making that determination the Court should consider extrinsic evidence relating to the prior contractual obligations and relationships between the Debtors and Calyon. Thus, as a threshold issue, the Court must first address the nature and scope of its inquiry before it can consider the substantive issue before the Court, i.e., whether the sale and repurchase of mortgage loans under the Contract is a repurchase agreement.

### 1.    Statutory Interpretation

"[C]ontemporary Supreme Court jurisprudence establishes that the purpose of statutory interpretation is to determine congressional intent."[19] To that end, the starting point is to examine the plain meaning of the text of the statute.[20] As the Supreme Court recently observed in *Hartford Underwriters Ins. Co. v. Union Planters Bank*, "when a statute's language is plain, the sole function of the courts, at least where the disposition by the text is not absurd, is to enforce it according to its terms."[21] Additionally, the Supreme Court has repeatedly

---

[19] Hon. Thomas F. Waldron and Neil M. Berman, *Principled Principles of Statutory Interpretation: A Judicial Perspective After Two Years of BAPCPA*, 81 Am. Bankr. L.J.195, 211 (2007).

[20] *Id.* at 229 ("Statutory analysis . . . must start with the text at issue to determine if its meaning can be understood from the text."). *See also Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253 (1992) ("When the words of a statute are unambiguous, then, this first canon is also the last: the judicial inquiry is complete.").

[21] *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 7 (2000). *See also United States v. Ron Pair Enters.*, 489 U.S. 235, 240 (1989); *Caminetti v. United States*, 242 U.S. 470, 485

stated that "[t]he United States Congress says in a statute what it means and means in a statute what it says there."[22]

Notwithstanding the foregoing, applying the plain meaning of the statute is the default entrance – not the mandatory exit.[23]  If the statute is ambiguous, the Court must use other canons of statutory construction, including legislative history where available, to determine the purpose of the statute.[24]  Moreover, regardless of whether the Court's interpretation of the statute's purpose is based upon the plain meaning of the text or the application of canons of statutory interpretation to determine the meaning of ambiguous text, it is appropriate to identify, if possible, a congressional purpose consistent with the Court's interpretation of the text at issue.[25]

Finally, there are a number of doctrines that are applied by courts in interpreting a statute even if the statute is not ambiguous – such as scrivener's error, absurdity, contrary to the drafter's intention and constitutional

---

(1917) ("It is elementary that the meaning of a statute must, in the first instance, be sought in the language in which the act is framed, and if that is plain, and if the law is within the constitutional authority of the law-making body which passed it, the sole function of the courts is to enforce it according to its terms.").

[22] *Hartford Underwriters Ins. Co.*, 530 U.S. at 6 (quoting *Connecticut Nat. Bank,* 503 U.S. at 254).

[23] Waldron and Berman, *supra* note 19, at 232.

[24] *See Price v. Delaware State Police Fed. Union (In re Price)*, 370 F.3d 362, 369 (3d Cir. 2004) ("Thus, ambiguity does not arise merely because a particular provision can, in isolation, be read in several ways or because a Code provision contains an obvious scrivener's error.  Nor does it arise if the ostensible plain meaning renders another provision of the Code superfluous.  Rather, a provision is ambiguous when, despite a studied examination of the statutory context, the natural reading of a provision remains elusive. In such situations of unclarity, 'where the mind labours to discover the design of the legislature, it seizes every thing from which aid can be derived,' including pre-Code practice, policy, and legislative history.") (internal citations omitted).

[25] *Lamie v. U.S. Trustee*, 540 U.S. 526, 539 (2004) ("Though we find it unnecessary to rely on the legislative history behind the 1994 enactment of § 330(a)(1), we find it instructive that the history creates more confusion than clarity about the congressional intent. History and policy considerations lend support both to petitioner's interpretation and to the holding we reach based on the plain language of the statute.").

avoidance.[26]    These doctrines serve as a "reality check" in determining the appropriate meaning of a statute.  Each of these doctrines, if applicable, supplies "a principled basis to decline to apply the plain meaning of the text at issue, or having found the text ambiguous, choose one interpretation over another."[27]

Section 101(47) of the Bankruptcy Code contains the definition of a repurchase agreement.  As applicable in this case, a repurchase agreement is an agreement, including related terms, which (i) provides for the transfer of one or more mortgage loans or interests in mortgage related securities or mortgage loans; (ii) against the transfer of funds by the transferee of such mortgage loans or interests in mortgage related securities or mortgage loans; (iii) with a simultaneous agreement by such transferee to transfer to the transferor thereof mortgage loans or interests in mortgage related securities or mortgage loans; (iv) at a date certain not later than 1 year after such transfer or on demand; and (v) against the transfer of funds.[28]  No other criteria are set forth in the statute for a contract to be considered a repurchase agreement under the Bankruptcy Code.

Notwithstanding the straightforward definition of repurchase agreement set forth in the statute, the Debtors argue that the Court should not focus on the text of the statute but rather the purpose of the statute – preserving the liquidity of the repo market by exempting repurchase agreement from significant portions of the Bankruptcy Code such as the automatic stay.[29]  Citing case law and the "model form" developed by Securities Industry and Financial Markets Association, the Debtors argue that the Contract lacks all indicia of a "true" repurchase agreement and, in substance, is a secured financing.

---

[26] Waldron and Berman, *supra* note 19, at 230-31.  *Consider Hartford Underwriters Ins. Co.*, 530 U.S. at 7 ("when a statute's language is plain, the sole function of the courts, *at least where the disposition by the text is not absurd*, is to enforce it according to its terms. ") (emphasis added).

[27] Waldron and Berman, *supra* note 19, at 230-31.

[28] 11 U.S.C. § 101(47).

[29] *See, e.g., In re Bevill, Bresler & Schulman Asset Mgmt. Corp.*, 878 F.2d at 746 ("The common element in all the uses of repurchase agreements is liquidity.").

While the Debtors are correct that the Contract contains certain terms that are inconsistent with the model form, that argument is misplaced. The model form and the case law cited by the Debtors are not the statute nor do they necessarily reflect the statue's purpose. The Debtors are correct in asserting that the Court should focus on divining the purpose of the statute to determine whether the Contract is a repurchase agreement. But the Supreme Court has instructed repeatedly that the best way to determine congressional intent is to apply the plain meaning of the text of the statute. The Court finds that Congress said what it meant and meant what it said in drafting the definition of repurchase agreement, i.e., if the criteria established in the statute are meant the contract is a repurchase agreement. No further inquiry or consideration of other contractual provisions is required.

Although not required, "[h]istory and policy considerations lend support . . . to the holding . . . based on the plain language of the statute."[30] The definition of repurchase agreement is incorporated into section 559 of the Bankruptcy Code. As noted earlier, since 1982, Congress has enacted a number of amendments to the Bankruptcy Code to preserve the liquidity of the repo market by exempting repurchase agreements from significant provisions of the Bankruptcy Code. Section 559 and its companion statute, section 555, preserve market liquidity by providing a "safe harbor" for non-defaulting repo participants "to terminate, liquidate or accelerate . . . repurchase agreements with the bankrupt or insolvent party."[31] Indeed, the legislative history of the 2005 amendments specifically provides that:

---

[30] *Lamie*, 540 U.S. at 539.

[31] H.R. Rep. 109-31, pt. 1, at 133 (2005).

> The reference to "repurchase and reverse repurchase transactions"
> is intended to eliminate any inquiry under section 555 and related
> provisions as to whether a repurchase or reverse repurchase
> transaction is a purchase and sale transaction or a secured
> financing. Repurchase and reverse repurchase transactions meeting
> certain criteria are already covered under the definition of
> "repurchase agreement" in the Bankruptcy Code.[32]

Succinctly stated, if the definition of "repurchase agreement" is met, the section 559 safe harbor provisions apply, period.  Similarly, if the definitions of "securities contract"[33] and "financial institution"[34] are met, the section 555 safe harbor applies, period.[35]  This conclusion is compelled by the plain meaning of the statute and is consistent with the policy and legislative history underlying the relevant provisions of the Bankruptcy Code.

Finally, none of the doctrines of scrivener's error; absurdity; contrary to the drafter's intention; nor constitutional avoidance are applicable in this case.  Thus, the Court will limit its inquiry into applying the definition set forth in section 101(47) of the Bankruptcy Code to determine whether the sale and repurchase of mortgage loans under the Contract is a repurchase agreement.

## 2.    Contract Interpretation

Having determined the appropriate scope of the inquiry, the Court must still consider what evidence it will consider in making its determination.  Although this is a separate question from the Court's interpretation of the statute, it is nonetheless guided by that conclusion.  The terms of the Contract relating to the sale and repurchase of mortgage loans are the only relevant evidence before the Court.  As such, the bulk, if not all, of the extrinsic evidence

---

[32] *Id.* at 130.

[33] As defined in 11 U.S.C. § 741(7).

[34] As defined in 11 U.S.C. § 101(22).

[35] Other than the Debtors' argument that the Contract is not a repurchase agreement, the Debtors do not contest that the Contract is a "securities contract."  Similarly, the Debtors do not contest that Calyon is a "financial institution."

proffered by the Debtors is simply irrelevant.  The remaining relevant, extrinsic evidence, if any, must be excluded under the parol evidence rule.

Under New York law,[36] "[w]hen interpreting a contract, the court should arrive at a construction which will give fair meaning to all of the language employed by the parties to reach a practical interpretation of the expressions of the parties so that their reasonable expectations will be realized."[37]  The starting point in gleaning the parties' intent is the same as that in statutory interpretation – plain meaning:

> Where the intention of the parties is clearly and unambiguously set forth, effect must be given to the intent as indicated by the language used. Finally, where the contract is clear and unambiguous on its face, the intent of the parties must be gleaned from within the four corners of the instrument. [38]

If the contract is clear, the Court will not look further for evidence of meaning. The consideration of parol evidence is only permissible if the terms of the agreement are ambiguous.[39]  As the relevant terms of the Contract are clear and unambiguous, the extrinsic evidence proffered by the Debtors relating to the prior contractual obligations and relationships between the Debtors and Calyon are inadmissible under the parol evidence rule.

## C.   Section 559 Applies to the Contract

Having addressed the nature and scope of the inquiry, the Court turns to the substantive issue, i.e., applying the plain meaning of the statute to the relevant terms of the Contract to determine whether the sale and repurchase of

---

[36] New York law controls the Contract.

[37] *Joseph v. Creek & Pines*, 217 A.D.2d 534, 629 N.Y.S.2d 75, 76 (2d Dep't 1995).

[38] *Fetner v. Fetner*, 293 A.D.2d 645, 741 N.Y.S.2d 256, 258 (2d Dep't 2002) (internal citations omitted).

[39] *See, e.g., Washington Hosp. v. White*, 889 F.2d 1294 (3d Cir. 1989) ("If a written contract is unambiguous, the parol evidence rule bars the use of extrinsic evidence for interpretation. If a written contract is ambiguous, the parol evidence rule does not prevent the use of extrinsic evidence to interpret the writing.").

mortgage loans under the Contract is a repurchase agreement and the applicability of the safe harbor provisions of sections 555 and 559 of the Bankruptcy Code. This turns out to be a simple task.

As discussed earlier, the sale and repurchase of mortgage loans under the Contract constitutes a repurchase agreement under the statute if it: (i) provides for the transfer of one or more mortgage loans or interests in mortgage related securities or mortgage loans; (ii) against the transfer of funds by the transferee of such mortgage loans or interests in mortgage related securities or mortgage loans; (iii) with a simultaneous agreement by such transferee to transfer to the transferor thereof mortgage loans or interests in mortgage related securities or mortgage loans; (iv) at a date certain not later than 1 year after such transfer or on demand; and (v) against the transfer of funds.[40]  All of these elements are satisfied here.

First, the Contract provides for the transfer of one or more mortgage loans or interests in mortgage loans.  Under the terms of the Contract, in order for the transaction to be considered a repurchase agreement, it must provide for the "sale or absolute transfer" of the mortgage loans to the Purchasers.  Otherwise, the Contract provides that it will be deemed a security agreement.  The Debtors argue that this contractual provision trumps the definition in the statute.  In other words, the Purchasers have agreed that in order for the Contract to constitute a repurchase agreement under the Bankruptcy Code it must provide for the "sale or absolute transfer" of the mortgage loans rather than the "transfer" of the mortgage loans.

The Court rejects this argument for two reasons.  The Court disagrees with the fundamental basis of the Debtors' argument, i.e., that the Contract only provides for the creation of a lien in the mortgage loans.  Moreover, the Debtors' argument fails under the plain meaning of section 101(54) of the Bankruptcy

---

[40] 11 U.S.C. § 101(47).

Code, which defines "transfer" to include the creation of a lien.  Thus, even if the Contract only provides for the creation of a lien in the mortgage loans, it still constitutes a "transfer" for the purpose of determining whether the sale and repurchase of mortgage loans under the Contract constitutes a repurchase agreement.

Second, the transfer of one or more mortgage loans or interests in mortgage loans from the Debtors to the Purchasers is against the transfer of funds from the Purchasers to the Debtors.

Third, the Contract contains a simultaneous agreement by the Purchasers to transfer the mortgage loans or interest in mortgage loans to the Debtors.

Fourth, the transfer of mortgage loans or interests in mortgage loans from Purchasers to the Debtors occurs within 180 days of the original transfer.

Fifth, the transfer of the mortgage loans or interests in mortgage loans from the Purchasers to the Debtors is against the transfer of funds by the Debtors to the Purchasers.

As the sale and repurchase of mortgage loans under the Contract is a repurchase agreement, section 559 of the Bankruptcy Code is applicable.[41]  No further criteria must be met.  Thus, subject to the discussion below concerning the servicing of the mortgage loans, the Purchasers (through Calyon) may enforce their rights under the Contract triggered by a condition of the kind specified in section 365(e)(1) of the Bankruptcy Code.

### D.    Section 555 Applies to the Contract

Section 555 of the Bankruptcy Codes excludes from the automatic stay the exercise of a contractual right by a financial institution, among others, to cause the liquidation, termination or acceleration of a "securities contract" (as defined by section 741 of the Bankruptcy Code).[42]    Accordingly, the Court must

---

[41] 11 U.S.C. § 559.

[42] 11 U.S.C. § 555.

determine whether 1) Calyon is a financial institution, and 2) the Contract is a securities contract.[43]  If so, section 555 is applicable.

The term "financial institution" is defined in section 101(22) of the Bankruptcy Code and includes "an entity (domestic or foreign) that is a commercial or savings bank."[44]  Calyon is a commercial bank and a subsidiary of Credit Agricole CIB, one of the world's largest financial institutions.  Thus, it is a "financial institution" under the Bankruptcy Code.

Section 741 of the Bankruptcy Code defines a securities contract as "a contract for the purchase, sale, or loan of a . . . mortgage loan, [or] any interest in a mortgage loan . . . and including any repurchase or reverse repurchase transaction on any such . . . mortgage loan, [or] interest . . . (whether or not such repurchase or reverse repurchase transaction is a "repurchase agreement", as defined in section 101)."[45]  Under the structure of the definition of securities contract, a repurchase transaction under section 741(7) includes both repurchase agreements as defined by section 101(47) of the Bankruptcy Code and transactions that do not meet the "repurchase agreement" definition.  As the Court has already determined that the Contract is a repurchase agreement, it is also a securities contract.

Interestingly, the analysis of repurchase agreements under section 555 and 559 and the effect of the safe harbor is virtually identical.  That was not always the case.  Prior to the 2005 amendments to the Bankruptcy Code, the definition of repurchase agreement was narrower and did not include, for example, the sale

---

[43] More precisely, the Court should determine whether the Purchasers are financial institutions. No evidence was proffered at trial, however, to allow the Court to make that determination. Nonetheless, the Court shall proceed in this instance based solely on whether Calyon is a financial institution because Calyon is acting as agent, the Court does not believe that the Debtors contest that any of the Purchasers are financial institutions, and the effect in this case of the safe harbor of section 555 is virtually identical to that of section 559, which the Court has already determined is applicable.  *See further* pp. 21-22, *infra*.

[44] 11 U.S.C. § 101(22).

[45] 11 U.S.C. § 741(7)(a)(i).

and repurchase of mortgage loans.  Thus, prior to 2005, a non-debtor party to a repurchase agreement that did not satisfy the definition of section 101(47) might argue that the agreement was nonetheless a securities contract entitling that party to the benefit of the safe harbor of section 555.  However, as the definition of securities contract did not expressly include repurchase agreements, resolution of the issue often required litigation.  As a result of the 2005 amendments, the definition of securities contract has been expanded to expressly include a repurchase agreement, the definition of which, in turn, has been broadened to include the sale and repurchase of mortgage loans, thus, resulting in the Court's somewhat repetitive analysis in this case.[46]

As the sale and repurchase of mortgage loans under the Contract is a securities contract and Calyon is a financial institution, section 555 of the Bankruptcy Code is applicable.  Subject to the discussion below concerning the servicing of the mortgage loans, Calyon may enforce its rights under the Contract triggered by a condition of the kind specified in section 365(e)(1) of the Bankruptcy Code.

### E.    Conclusion

The sale and repurchase of mortgage loans under the Contract is a repurchase agreement as defined in section 101(47) of the Bankruptcy Code and thus, pursuant to sections 362(b)(7), 555 and 559 of the Bankruptcy Code, the rights of the non-debtor party to the contract related to the sale and repurchase of mortgage loans are not stayed, avoided or otherwise limited by the operation of any provision of the Bankruptcy Code.  The Court finds that, under the plain meaning of section 101(47) of the Bankruptcy Code, the contract for the sale and repurchase of mortgage loans in this case is a repurchase agreement under the statute and the "safe harbor" provisions of sections 555 and 559 of the Bankruptcy Code are applicable.

---

[46] *See generally* 5 COLLIER ON BANKRUPTCY ¶¶ 555.02 and 559.02.

## II.    The Portion Of The Contract Providing For The Servicing Of Mortgage Loans Is Not Protected Under The "Safe Harbor" Provisions Of Sections 555 And 559 Of The Bankruptcy Code.

The Court has found that the sale and repurchase of mortgage loans under the Contract is a repurchase agreement.  The Contract also provides, however, for the servicing of the mortgage loans subject to the Contract.  More specifically, the Contract provides that the mortgage loans were sold to the Purchasers on a servicing retained basis, i.e., the Debtors retained the right to designate the servicer under the loans.  AHM Servicing is the designated servicer under the mortgage loans under the Contract and, thus, is entitled to the monthly servicing fee of 50 basis points applied to the UPB of the mortgage loans being serviced.

Thus, the second issue before the Court is whether the portion of the Contract providing for the servicing of mortgage loans is protected under the safe harbor provisions of sections 555 and 559 of the Bankruptcy Code.  The Court finds that the servicing of mortgage loans is not protected under the safe harbor provisions because: (i) under applicable law, the portion of the Contract providing for the servicing of the mortgage loans is severable from the portion of the Contract providing for the sale and repurchase of mortgage loans; (ii) the portion of the Contract providing for servicing mortgage loans is neither a repurchase agreement nor a securities contract under the Bankruptcy Code.

### A.    The Servicing of Mortgage Loans Under the Contract Is Severable From The Sale and Repurchase of Mortgage Loans Under the Contract.

As a preliminary matter, the Court must determine whether the portion of the Contract providing for the servicing of the mortgage loans is severable from the portion of the Contract providing for the sale and repurchase of mortgage loans.  There is no formulaic test under New York[47] law for determining whether a contract is severable.[48]  Rather, as with all contract interpretation, severability

---

[47] As stated earlier, New York law governs the Contract.

[48] *O'Connell v. Prakope (In re Prakope)*, 317 B.R. 593, 599 (Bankr. E.D.N.Y. 2004).

"is a question of the parties' intent, to be determined from the language employed by the parties, viewed in light of the circumstances surrounding them at the time they contracted."[49]  More specifically, though, under New York law, a contract is severable "when by its terms, nature and purpose, it is susceptible of division and apportionment."[50]

Applying the controlling law to the unambiguous terms of the Contract, it is clear that the servicing of the mortgage loans is severable from the sale and repurchase of mortgage loans.  The terms, nature and purpose of a repurchase agreement are different from an agreement relating to servicing mortgage loans. The sale and repurchase of mortgage loans concerns the Debtors obtaining financing through the repo market for the origination of mortgage loans and the Purchasers providing that financing in a manner that preserves the liquidity of their investment.  Servicing a mortgage loan, on the other hand, encompasses collecting mortgage payments, administering tax and insurance escrows, responding to borrower inquiries, and maintaining control over the collection and default mitigation processes.  Importantly, regardless of whether a mortgage loan is owned by the loan originator, a party to a repurchase agreement, a securitization trust or a private investor, the loan requires servicing.[51]

To the extent the Contract concerns the purchase and sale of the right to designate the mortgage servicer (as opposed to setting the terms and conditions of the actual servicing) it is still different from an agreement for the purchase or sale of the mortgage itself.  Mortgage loans are bought and sold on either a

---

[49]*Atlantic Mut. Ins. Co. v. Balfour MacLaine Int'l (In re Balfour MacLaine Int'l)*, 85 F.3d 68, 81 (2d Cir. 1996).

[50] *Id*. (quoting *First S&L Ass'n v. Am. Home Assur. Co.*, 29 N.Y.2d 297, 277 N.E.2d 638, 639, 327 N.Y.S.2d 609 (N.Y. 1971)). *Compare In re Gardinier, Inc.*, 831 F.2d 974, 976 (11th Cir. 1987) (Contract is severable where (i) nature and purpose of agreements is different; (ii) consideration for each agreement is separate and distinct; and (iii) obligations of each party are not interrelated).

[51] This is not the case with other types of investments included in the definition of repurchase agreement under section 101(47) such as certificates of deposit or United States securities.

"servicing retained" or a "servicing released" basis.  In this case, the mortgage loans were sold to the Purchasers on a servicing retained basis, i.e., the Debtors retained the right to designate the servicer under the loans.  Thus, as drafted by Calyon and agreed to by the parties, the Contract itself severs the owner of the mortgage loans (the Purchasers) from the party with the right to designate the servicer (the Debtors).  This is, in and of itself, strong evidence of the parties' intent to sever the servicing or the right to designate the servicer from the sale and repurchase of the mortgage loans.

Moreover, the consideration for servicing mortgage loans is readily apportioned from the other consideration flowing under the Contract.  The servicer of the mortgage loans subject to the Contract in this case is entitled to a monthly servicing fee of 50 basis points applied to the UPB of the mortgage loans being serviced.  This is distinct from the sale and repurchase of the mortgage loans and the payment by the Debtors of the "Price Differential" to the Purchasers under the Contract, which is in effect the financing charge paid by the Debtors for the use of the Purchasers' funds to originate mortgage loans.

To the extent that extrinsic evidence may be appropriately considered, it also supports a finding that the Contract is severable.  For example, the testimony at trial established that mortgage servicing is viewed as an entirely separate asset and that asset is traded separately and accorded distinct accounting treatment.  Moreover, Calyon acknowledged the distinct nature of the two agreements by issuing two separate notices of default on the same day – one to the sellers of the mortgage loans and a separate notice to the servicer.

In response, Calyon argues that severing the servicing provisions of the Contract would improperly impair the Purchasers' ability to liquidate the mortgage loans, thus, frustrating the purpose of a repurchase agreement and the safe harbor provisions.  This argument, however, is contrary to the facts before the Court.  The evidence established that mortgage loans can be bought and sold on either a "servicing retained" or a "servicing released" basis.  All things being

equal, a buyer will pay a higher price in a servicing released transaction because the buyer is purchasing the underlying mortgage loan and the right to receive the payments for servicing the loan (which presumably generate a profit for the servicer).

In this case, the Purchasers can liquidate their investment by selling the mortgage loans on a servicing retained basis, albeit at a lower price than if they could sell the loans on a servicing released basis.  However, as the Purchasers did not pay a higher price in purchasing the mortgage loans under the Contract in the first instance (as would have been the case if they had bought the loans on a servicing released basis), the Court is not particularly troubled by their receipt of a lower price.  Indeed, if the Court were to allow otherwise, the Purchasers would receive a windfall – the right to designate the servicer without paying the concomitant premium.

> **B.**    **The Contract For Servicing Mortgage Loans Is Neither A Repurchase Agreement Nor A Securities Contract.**

Even though the portion of the Contract providing for the servicing of the mortgage loans is severable, it may be subject to the safe harbor provisions of sections 555 and 559 of the Bankruptcy Code if, in and of itself, it is a repurchase agreement or a securities contract.  That is not the case.  Thus, the safe harbor provisions are inapplicable to any defaults relating to the servicing of the mortgage loans.

As discussed at length earlier, section 101(47) of the Bankruptcy Code contains the definition of a repurchase agreement.  Section 101(47) provides, in part, that a repurchase agreement is "an agreement, *including related terms*, which provides for the transfer of one or more . . . mortgage loans [or] interests in mortgage related securities or mortgage loans."[52]  Section 741 of the Bankruptcy Code defines a securities contract as "a contract for the purchase, sale, or loan of a . . . mortgage loan, [or] any interest in a mortgage loan . . . and including any

---

[52] 11 U.S.C. § 101(47) (emphasis added).

repurchase or reverse repurchase transaction on any such . . . mortgage loan, [or] interest . . . (whether or not such repurchase or reverse repurchase transaction is a "repurchase agreement", as defined in section 101)."[53]

The portion of the Contract providing for the servicing of the mortgage loans meets neither the "repurchase agreement" nor "securities contract" definitions.  First, it is contrary to the plain meaning of the words to include the servicing of mortgage loans within the meaning of "mortgage loan" or "interest in a mortgage loan."  The former, i.e., whether the servicing of mortgage loans is a mortgage loan, hardly deserves mention.  As to the latter, i.e., whether the servicing of mortgage loan constitutes an interest in a mortgage loan, "interest" in this context means "a financial share or stake in something: the relation of being one of the owners or beneficiaries of an asset, company, etc."[54]    As the right to control servicing of a mortgage loan is separate and distinct from ownership of that mortgage, it simply cannot constitute an ownership interest in the underlying mortgage.

Moreover, servicing rights cannot constitute an "interest in a mortgage loan" for purposes of section 101(47) or section 741(7) because the text in section 541(d) of the Bankruptcy Code treats "servicing" separately from "an interest in a mortgage."[55]    Since section 541(d) refers to *servicing both* mortgages and *interests in mortgages*, servicing itself cannot be an "interest in mortgages."  If servicing rights were an interest in mortgages, then section 541(d) would be

---

[53] 11 U.S.C. § 741(7)(a)(i).

[54] I SHORTER OXFORD ENGLISH DICTIONARY, p. 1408 (6th ed. 2007).

[55] Section 541(d) of the Bankruptcy Code provides:

> Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest, such as a mortgage secured by real property, or an interest in such a mortgage, sold by the debtor but as to which the debtor retains legal title to service or supervise the servicing of such mortgage or interest, becomes property of the estate under subsection (a)(1) or (2) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

referring to "servicing interest in servicing" – an absurd reading.[56]  Similarly, the "interests in mortgage loans" referred to in sections 101(47) and 741(7) of the Bankruptcy Code cannot be read to include servicing.

Finally, the servicing rights and the right to designate the servicer are not "related terms" to those portions of the Contract that constitute a repurchase agreement.   As a separate asset, servicing is not related to the underlying transaction, i.e., the purchase and sale of mortgage loans as part of a financing transaction.   This is further evidenced by the fact that many repurchase agreements do not address servicing, and separate agreements may govern servicing exclusively.  Indeed, the phrase "related terms" existed *prior to* the 2005 amendments where mortgage loans and interest in mortgage loans were added. It therefore could not have meant the right to service because, at that time, the repurchase agreement definition included only securities with respect to which there were no servicing rights, e.g., "certificates of deposit," "eligible bankers' acceptances," and "qualified foreign government securities. "

Thus, the portion of the Contract providing for the servicing of the mortgage loans is not subject to the safe harbor provisions of sections 555 and 559 of the Bankruptcy Code and Calyon may not enforce its rights relating to the servicing of the mortgage loans triggered by a condition of the kind specified in section 365(e)(1) of the Bankruptcy Code.

### C.      Calyon Is Not Entitled To Specific Performance.

The third and final issue before the Court is whether Calyon is entitled to specific performance to require the Debtors to transfer the rights and obligations relating to servicing the mortgage loans to Calyon.  As the Court finds that the portion of the Contract providing for the servicing of the mortgage loans is not subject to the safe harbor provisions, there is simply no basis to require the

---

[56] *Hartford Underwriters Ins. Co.*, 530 U.S. at 7 ("when a statute's language is plain, the sole function of the courts, *at least where the disposition by the text is not absurd*, is to enforce it according to its terms. ") (emphasis added).

Debtors to transfer property of the estate (i.e., the right to service of the mortgage loans under the contract) to Calyon.[57]

## CONCLUSION

The Court finds that, under the plain meaning of section 101(47) of the Bankruptcy Code, the contract for the sale and repurchase of mortgage loans in this case is a repurchase agreement under the statute and the safe harbor provisions of sections 555 and 559 of the Bankruptcy Code are applicable. The Court further finds, however, that the servicing of mortgage loans is *not* protected under the safe harbor provisions because: (i) under applicable law, the portion of the contract providing for the servicing of the mortgage loans is severable from the portion of the contract providing for the sale and repurchase of mortgage loans; and (ii) the portion of the contract for servicing mortgage loans is neither a "repurchase agreement" nor a "securities contract" under the Bankruptcy Code. Finally, as the Court finds that the portion of the Contract providing for the servicing of the mortgage loans is not subject to the safe harbor provisions, there is no basis to require the Debtors to transfer property of the estate (i.e., the right to service of the mortgage loans under the contract) to Calyon.

Calyon's counsel is instructed to consult with Debtors' counsel and to submit a proposed order consistent with this opinion under certification of counsel.

---

[57] The Debtors argue that, even if the safe harbor provisions are applicable, the economic injuries Calyon alleges arise from the Debtors' failure to surrender the servicing are compensable by payment of money damages and, thus, do not give rise to entitlement to injunctive relief or specific performance. Because the Court finds that the portion of the Contract providing for the servicing of the mortgage loans is property of the estate and not subject to the safe harbor provisions, it need not address this argument.